**UNITED STATES of America,**

v.

**Jung Yul YU, Appellant.**

**No. 91–1436.**

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1991.

Decided Jan. 28, 1992.

---

Arnold R. Silverstein (argued), Val P. Wilson (argued), Wilson & Silverstein, Philadelphia, Pa., for appellant.

Kristin R. Hayes (argued), Asst. U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Michael M. Baylson, U.S. Atty., Philadelphia, Pa., for appellee.

Before BECKER, GREENBERG, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

Appellant Jung Yul Yu appeals from a judgment of conviction and sentence entered on May 16, 1991, sentencing him to ten months' imprisonment on his plea of guilty to two counts of bribery of a public official, in violation of 18 U.S.C. § 201(b)(1)(A). The judgment provided that five months of the sentence could be served in home confinement with work release and church attendance privileges. This appeal raises questions regarding the power of the district court to depart downward from the range provided by the Sentencing Guidelines by reason of claimed cultural differences between Korea, Yu's country of origin, and the United States.

The essential facts are not in dispute. Yu was born in Korea in 1931 and was graduated from law school there. While in Korea he worked for what his attorney characterizes as the Korean equivalent of the Internal Revenue Service. In 1976, when he was 46 years old, he immigrated to the United States with his wife and four children, and he has become a naturalized

citizen.[1] His children have received college educations in this country. Yu took some courses at Temple University and subsequently obtained a doctorate degree through a correspondence course at another institution. He is referred to as "Dr.", apparently on the basis of either that degree or one earned in Korea. Upon his arrival in the United States, Yu worked in a factory, but in 1980 he opened an accounting office which he describes in his brief as a "tax preparation business." He seems to have been financially successful, as the presentence report shows that he owns three properties, all with substantial equities above mortgage debt.

Between August 1988 and May 1989, during an audit of Yu's and his wife's joint tax return, which was tape recorded without Yu's knowledge, Yu made certain small payments to the examining agent for the agent's own use, one payment being $250. Ultimately, he was advised that he owed $27,000 in tax deficiencies and penalties. Yu attempted to take care of this problem by paying the agent $5,000, for which he received a no-change letter. He was indicted for bribery for making the $250 and $5,000 payments.

Yu's adjusted offense level was 14 and, inasmuch as the court allowed him a 2-level adjustment for acceptance of responsibility, his total offense level was 12. Thus, as his criminal history category was I, his guideline range was 10 to 16 months.

At sentencing Yu urged the district court to depart downward from that range because of cultural differences between the United States and Korea. He seemed to view this case as thereby involving a mitigating circumstance not adequately considered by the Sentencing Commission in formulating the guidelines. *See* 18 U.S.C. § 3553(b). In support of this contention he made an offer of proof that, based on his Korean experience, he considered the bribe as an honorarium and that it could be viewed as an insult not to offer the payment. He further urged that the plea

agreement itself authorized a downward departure. On the other hand, the government contended that, while there might be cultural differences between the United States and Korea, in view of his long residency in this country Yu could not reasonably rely on his Korean background for a departure. Furthermore, the government regarded Yu's contention as barred by Sentencing Guidelines § 5H1.10 which indicates that "national origin" is not relevant in the determination of a sentence. The district court held that it did not have the power to depart downward but sentenced Yu at the bottom of the applicable range, emphasizing that in refusing to depart it was not exercising discretion. Rather, the district court stated: "just so that it's clear I'm not exercising any discretion not to use a power that I have, I'm holding that I lack the power." Yu appeals and we have jurisdiction under 18 U.S.C. § 3742(a)(2).

On this appeal Yu repeats his argument that the cultural differences between Korea and the United States justify the downward departure. While he recognizes that section 5H1.10 provides that "national origin" is not relevant in the determination of a sentence, he urges that this guideline is a non-binding policy statement which, in any event, does not exclude a downward departure on the basis of culture, a factor he regards as distinct from national origin. He further contends that he is elderly and frail and would face danger in prison and that by reason of the publication of his name in Korean and English language newspapers he has "suffered a great loss of face." He finally urges that since his plea agreement provides that the court "*may* impose any sentence authorized by law, including a sentence that departs from any applicable sentencing guideline range" the district court had the power to depart downward. The government contends that the guideline is binding and precludes downward departure on the basis of Yu's place of national origin which is what it believes he is seeking. It also contends that the plea agreement did not authorize a

**1.** The presentence report does not indicate that he was naturalized but the assistant United States attorney made that representation at the

sentencing and was not contradicted by Yu's attorney. App. at 55.

downward departure, as it simply acknowledged that any lawful sentence could be imposed.

■ If we decided this case by determining whether the Sentencing Commission adequately took into consideration the circumstances which Yu has advanced for departure, *see* 18 U.S.C. § 3553(b), we would undoubtedly exercise plenary review. *United States v. Medeiros*, 884 F.2d 75, 78 (3d Cir.1989); *United States v. Uca*, 867 F.2d 783, 786 (3d Cir.1989); *United States v. Ryan*, 866 F.2d 604, 610 (3d Cir.1989). However, we see no need to make such a plenary construction of the guidelines, for it is perfectly clear for the reasons we explain below that the district court would have abused its discretion if it had departed downward in this case. Thus, we prefer to leave to another day the question of whether a foreign culture is subsumed within the term "national origin," a factor which the Sentencing Commission, faithful to its congressional mandate, 28 U.S.C. § 994(d), has deemed irrelevant in the determination of a sentence.

Hence, we do not decide that "national origin," as that term appears in the Sentencing Guidelines, includes within it any and all cultural differences. Although the concept of sentencing based upon one's culture raises a number of questions as to whether differences in culture within the same society should be, or can be, identified as focal points for sentencing or whether cultural differences deemed to be a matter for sentencing consideration should be restricted to cultures which are foreign to American shores, we leave those questions to be answered by the Sentencing Commission which Congress has designated to deal with such issues. Suffice it

to say, this case does not require resolution of "cultural" v. "natural origin" issues.

Accordingly, as there was no basis to depart here, we will simply assume without deciding that in some cases the cultural differences between the United States and another country may justify downward departure. Thus, it is conceivable that an unschooled recent immigrant or a foreign traveler might reasonably point to practices in his country of origin that would justify a downward departure on the grounds that while he intended to do the acts for which he was convicted and was thus criminally liable, he did not recognize the extent of his culpability in this country.[2] But this is not such a case. While Yu points to his Korean origin as the source of his cultural values, he never contended in the district court that at the time of the bribes in this case he did not understand that his actions violated our laws. This point was not lost on us when we examined the record and thus at oral argument we directly asked whether Yu contended that, at the time of the offenses, he thought his conduct in bribing the agent was consistent with the culture of this country. We did not receive an affirmative response.[3]

Of course, this is hardly surprising. Yu had been in this country for about 12 years and was a naturalized citizen when he committed the offenses. He was a professional tax preparer who had accumulated property and accordingly had at least some familiarity with United States laws. In addition, he had some college-level and legal education in this country and had been well educated in Korea. Indeed, he almost admits that he had no reason to believe that the culture in this country countenanced the bribery of IRS agents. He implicitly demonstrates this by pointing out

2. Actually it is doubtful at best that cultural differences are allowable under the guidelines, even if it would appear to be reasonable to depart on that basis in a particular case. *See United States v. Natal–Rivera*, 879 F.2d 391 (8th Cir.1989).

3. While the dissent suggests that there is a disputed factual issue regarding whether or not Yu knew that in this country bribing of revenue agents is not tolerated, and further suggests that

we resolved the matter against him by our inquiry at oral argument, this is not so. Our inquiry at oral argument simply confirmed our understanding of the record that Yu never contended in the district court that he did not understand that he was violating the law. Thus, there cannot possibly be a dispute of fact on the issue of Yu's knowledge of the law and we need not remand the matter to see if Yu can prove a contention he has never made.

that when he sought to cooperate with the government to encourage it to move for a downward departure pursuant to Sentencing Guidelines § 5K1.1,[4] he was unsuccessful for, as he explains in his brief, he could not cooperate with the government because he had no criminal associates. Accordingly, Yu contends that he "was not able to provide the government with any valuable information." Brief at 18. He then, in effect, reiterates that he knew the American way, and indeed usually lived by it, describing his own conduct as a single act "of aberrant behavior." The fact is that insofar as we can ascertain from the record, Yu has been a model citizen except for the conduct which led to these proceedings. In the circumstances, there is no basis to avoid the obvious conclusion that Yu was motivated to offer a $5,000 bribe to avoid a $27,000 tax liability by a desire to save $22,000, rather than by his belief that he was culturally bound to make the offer.[5] The bottom line is that, while immigrants lawfully entering the United States are welcome to bring their cultures with them, the aspect of a culture which justifies the bribing of federal agents must be left abroad.[6]

Some of Yu's other arguments were not raised in the district court and thus to that extent have not been preserved and in any event are without merit. *See United States v. Batka*, 916 F.2d 118, 120 (3d Cir.1990). There is no reason to conclude that Yu cannot be adequately protected for the short time he will be in actual custody. Furthermore, the shame which he has felt upon conviction from a few newspaper articles does not differ in character from that felt by many otherwise law-abiding persons upon being criminally convicted. Finally, we construe the plea agreement, which recognizes the court's right to depart from the applicable sentencing range, simply to mean that the court can impose a sentence authorized by law and the guidelines. This standard language does nothing more than preclude a defendant from claiming surprise if the court departs from the guidelines range and certainly could not be the basis to jettison the guidelines.

The judgment of conviction and sentence of May 16, 1991, will be affirmed.

BECKER, Circuit Judge, dissenting.

Based on his traditional Korean cultural background, the defendant Yu sought a downward departure from the otherwise applicable sentencing range. United States Sentencing Guideline ("USSG") § 5H1.10 expressly prohibits taking race, national origin, and socioeconomic status into account in sentencing. The district court held that it could not legally depart from the sentencing range because USSG § 5H1.10 subsumes cultural differences in its treatment of national origin, and hence implicitly prohibits taking cultural differences into account during sentencing. The government endorses this position.

The majority declines to confront the question whether USSG § 5H1.10 prohibits consideration of cultural differences. It

**4.** § 5K1.1. *Substantial Assistance to Authorities* (Policy Statement)

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

**5.** While we reach our result on an abuse of discretion analysis, we point out that the same result might well be reached by a plenary conclusion that a downward departure can never be justified on the basis of the defendant's cultural background when the defendant understood the culture of this country. *See United States v. Medeiros*, 884 F.2d at 78. This plenary analysis, of course, would be different than ascertaining whether cultural differences are subsumed within the term "national origin." It is, however, not necessary to make this plenary determination as the downward departure could not be sustained even on a deferential standard of review.

**6.** The parties have cited a number of other cases implicating the culture differences issue. *See United States v. Jagmohan*, 909 F.2d 61 (2d Cir.1990); *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990); *United States v. Natal–Rivera*, 879 F.2d 391 (8th Cir.1989). However, we see no profit in discussing them as none formulates an overarching principle that we could follow to resolve this case, which is obviously dependent upon its particular facts.

affirms the sentence on the ground that even if cultural differences may be considered, the district court would have abused its discretion to depart on these facts. I believe that reaching the question whether cultural differences may be considered in sentencing is necessary because, as I discuss below, the record is not factually settled, as the majority implies.[1] I therefore turn to the scope of USSG § 5H.10.

## I. PROPER CONSTRUCTION OF USSG § 5H1.10

### A. *Nature of the Inquiry*

In a world without sentencing guidelines, a sentencing court might consider a defendant's different cultural background relevant to the appropriate sentence. The majority itself gives the example of a visitor or recent immigrant from a foreign land who, although intending to commit an act that is a crime in this country, did not intend to break the law here because the practice was customary (and presumably legal) in his or her homeland. Of course, ignorance of American law is not an excuse for criminal conduct, but it might be considered a mitigating factor at sentencing for at least two reasons. First, the defendant's conduct may be more understandable than that of someone who grew up in this country: the defendant may have had

little reason to know better. Second, the defendant might be less likely than an ordinary offender to repeat his or her offense.[2]

One can easily come up with other examples, but the basic (and I believe uncontroversial) point is that cultural differences are sometimes logically relevant to determining a proper sentence. The government does not controvert that point; rather its position is that the Sentencing Commission has declared cultural differences *legally irrelevant.* The Guidelines certainly do not affirmatively approve taking cultural differences into account as a basis for either an offense level adjustment or a departure. The question is thus whether the Sentencing Commission failed to consider cultural differences at all (in which case cultural differences may be a proper basis for departure) or did consider them and rejected their use (in which case departure based on cultural differences is legally forbidden).

That is the approach mandated by 18 U.S.C. § 3553(b) (1988), which provides that courts shall impose sentences within the Guideline ranges "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission ... that should result in a sentence" outside the range normally indicated by the Guidelines. See

---

1. Even if the majority were correct on its view of the facts, and therefore correct that departure (if permissible) would have been an abuse of discretion, I do not believe that it should have avoided the logically prior issue of Guideline construction. In my view, the normally salutary principle of judicial restraint does not apply with full force to determinations of the scope of particular Guidelines. In particular, the success of the Guidelines system depends on judges' pointing out to the Commission potential grounds for departure that it has not considered.

   The Guidelines were meant to evolve. See 28 U.S.C. § 991(b)(1), (2) (1988) (Commission not only to develop initial Guidelines, but also to evaluate them on an ongoing basis); 28 U.S.C. § 994(*o*), (p) (1988) (Commission required to review Guidelines periodically and empowered to submit amendments to Congress). The evolution does not simply involve the Commission and Congress; the courts are essential players

   as well, especially in the area of departures. Indeed, the Commission's basic policy on departures recognizes the need for a dialogue between the Commission and the courts. See USSG ch. 1, pt. A, ¶ 4(b) (Commission to monitor departures to determine how to refine Guidelines). The Commission constantly invites judicial comment on problem areas in the Guidelines.

   I do not suggest that courts should decide Guidelines issues not well presented by the cases in front of them. I only suggest that courts should not avoid deciding issues of Guidelines interpretation that are squarely presented.

2. I agree with the implicit premise of the majority opinion that a defendant who is or should be familiar with this country's laws and traditions may not invoke ignorance based on the cultural differences of his or her nation of origin to obtain a reduced sentence. In such a case, the defendant would have reason to know better and is no less likely a candidate for recidivism.

also 28 U.S.C. § 991(b)(1)(B) (1988) (similar language). The *only* sources to which a court may look to determine whether the Commission adequately took a circumstance into consideration are the Guidelines themselves and official Policy Statements and Commentary from the Sentencing Commission itself. 18 U.S.C. § 3553(b).

It is also important to emphasize what this inquiry does not entail. Our job in interpreting this Guideline is *not* to decide whether departures on the ground of cultural differences are good or bad in general. Certainly one can envision a parade of horribles that might follow if courts readily granted such departures. But there are three answers to that concern. First, our role in the evolutionary process is solely to decide what the Sentencing Commission did or did not take into account in the Guidelines, not to guess what it or Congress would do if presented with these arguments. Second, as I will explain below, even under current law, only some sorts of cultural differences can ever justify a departure. Third, even within that narrow category, actual departures will be rare. To hold that the courts have the power to depart on the basis of some cultural differences is not to say that they should or must on the facts of any particular case. A district court is always free to refuse to depart (a decision that this court has held is not subject to appellate review, *United States v. Denardi*, 892 F.2d 269 (3d Cir. 1989)), and if the district court does depart, the courts of appeals have the power to reverse the departure as an abuse of discretion. In sum, the parade of horribles is not only irrelevant to our inquiry, but would not happen in any event.

### B. *Cultural Differences as a Basis for Departure*

In deciding which types of cultural differences the Commission took into account in USSG § 5H1.10, the place to start is the text of the Guideline itself. It provides:

§ 5H1.10 *Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status*

These factors are not relevant in the determination of a sentence.

Two things are worth noting about the Guideline. First, technically it is not a Guideline at all, but a Policy Statement. Contrary to Yu's protestations, however, that makes no difference to our inquiry. As noted above, in 18 U.S.C. § 3553(b), Congress told the courts to consider Policy Statements and official Commentary as well as full-fledged Sentencing Guidelines in determining whether the Commission adequately took a circumstance into consideration.

Second, USSG § 5H1.10 is an absolute prohibition against taking the listed factors into consideration. Other 5H1 Policy Statements provide that other factors, such as military service, family ties, employment record, and physical and mental conditions are not *ordinarily* relevant in sentencing. See generally USSG ch. 5, pt. H. In extremely unusual cases, those factors may justify a departure, but in no circumstances may a court *ever* depart based on race, sex, national origin, creed, religion or socioeconomic status. See also USSG § 5H1.4 (drug or alcohol dependence never a reason to depart downward); USSG § 5K1.12 (economic hardship and personal financial difficulties as causes for crime do not warrant sentence decrease).

The government's position is that "cultural differences" is shorthand for distinctions based on national origin. The government offers no legislative history of USSG § 5H1.10 to support such a broad interpretation of "national origin," and I have found none. USSG § 5H1.10 has no legislative history, but it was undoubtedly based on Congress's statutory directive in 28 U.S.C. § 994(d), the last sentence of which reads: "The Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." We might assume that the Commission meant to carry over Congress's intent, but even if so, the legislative history of that portion of subsection 994(d) is very sparse.

The Senate Report merely quotes the language enacted and explains:

> The Committee added the provision to make it absolutely clear that it was not the purpose of the list of offender characteristics set forth in subsection (d) to suggest in any way that the Committee believed that it might be appropriate, for example, to afford preferential treatment to defendants of a particular race or religion or level of affluence, or to relegate to prisons defendants who are poor, uneducated, and in need of education and vocational training.

S.Rep. No. 98–225, 98th Cong. 1st Sess. 171 (1983), in 1984 U.S.Code Cong. & Admin.News 3182, 3354. The legislative history of the statute at best suggests that Congress meant for the Commission to adopt an Equal Protection-style Guideline,[3] but as to which characteristics are forbidden considerations, it tells us no more than the plain language of the Guideline.

And if we must take a plain language view of the matter, it seems plain to me that cultural and national origin distinctions are not the same. Many Chicanos are American-born but have a distinct culture. A foreign-born person may have moved here as a child and have no noticeable cultural differences. I know of no case holding that cultural differences are equivalent to distinctions based on national origin.[4]

But cultural differences are, of course, sometimes linked to national origin (and to race and socioeconomic background as well). Therefore "cultural differences" no further defined is too broad a basis for departure; the legality of departure depends on the *type* of cultural difference. USSG § 5H1.10 in fact rules out consideration of many cultural differences. For example, if a "cultural differences" claim is really a claim for special treatment based on ethnicity, it must be denied. Thus an African–American defendant may not receive a downward departure because he or she has suffered from society's historical discrimination against African–Americans and their culture. See *United States v. Prestemon*, 929 F.2d 1275 (8th Cir.1991) (no departure for biracial defendant). If a "cultural differences" claim is a surrogate for an alcohol-related excuse, it must fail because USSG § 5H1.4 specifically refuses to allow abuse of alcohol to reduce culpability. See *United States v. Lowden*, 905 F.2d 1448 (10th Cir.1990) (no departure allowed based on the prevalence of alcohol abuse on Indian reservations). Similarly a court may never grant a departure on a claim that most people with the defendant's cultural background grow up in poverty, because USSG § 5K1.10 says that socioeconomic status may not be considered in sentencing.

Therefore, a sentencing court must break down a "cultural differences" claim to determine the true basis on which a departure is sought. Then the court must determine how the Guidelines treat that true basis. For example, if a defendant seeks a departure nominally based on "cultural differences" that is in reality based on personal characteristics of the sort listed in USSG §§ 5H1.1 to 5H1.6 and 5H1.11, departure is ordinarily (but not always) improper because the Commission has said in

---

**3.** The Report added in a footnote:

> The requirement of neutrality with regard to such factors is not a requirement of blindness. In sentencing a person to imprisonment it would be appropriate to have a judge consider, for example, recommending placement in an institution equipped to accommodate the religious dietary laws followed by the defendant, or an institution housing prisoners of the defendant's sex.

Id. at 171 n. 409, 1984 U.S.Code Cong. & Admin.News at 3354 n. 409. This too seems consistent with an Equal Protection interpretation.

**4.** In *United States v. Natal–Rivera*, 879 F.2d 391 (8th Cir.1989), the court did affirm the district court's refusal to take into account the alleged socialization of a Puerto Rican woman to follow her husband's commands. But Natal–Rivera herself argued that USSG § 5H1.10 equated national origin and cultural differences; her argument was that the Guideline violated due process for that reason. The court did not have to analyze whether the equation was true; it merely assumed that was so and went on to say why such a rule is constitutionally permissible. I too have no doubt that the Commission could constitutionally adopt a Guideline banning consideration of cultural differences, but that is not the question here.

those Guidelines that those factors "are not ordinarily relevant" in departure determinations. See *United States v. Rodriguez*, 882 F.2d 1059 (6th Cir.1989) (inability to speak English immaterial to sentence). But see *United States v. Big Crow*, 898 F.2d 1326 (8th Cir.1990) (downward departure for Indian defendant approved in extraordinary case).

Most relevant here, if a defendant seeks a departure based on excusable ignorance of American cultural norms that led to his or her criminal conduct, I know of nothing in any Guideline, Policy Statement or official Commentary that forecloses departure on that basis. Nor do I know of any Guideline, Policy Statement or official Commentary that forecloses arguments that the defendant deserves a lesser sentence because he or she will receive extraordinary informal punishment in his or her ethnic community, although Yu may have raised this for the first time on appeal so that this argument may not be properly before us.[5] Under 18 U.S.C. § 3553(b), those sorts of cultural differences are therefore not "adequately taken into consideration" by the Guidelines, and therefore may, in some cases, form the basis for a departure. Of course, in most cases, departures on these grounds will not be and should not be granted, but (for now at least) the Guidelines do not categorically foreclose such departures.[6]

## II. THE PROPER RESULT ON THIS FACTUAL RECORD

In support of his contention that cultural differences justified a downward departure in his case, Yu proffered testimony of witnesses that he is a traditional Korean; that in Korea, where he lived most of his life, citizens frequently give underpaid government bureaucrats something under the table; and that failure to give such an "honorarium" is considered an insult. I have no idea whether that is true, and the district court refused to permit Yu's witnesses to testify to that effect, believing that USSG § 5H1.10 made that evidence immaterial because the court could not depart on the suggested ground. But Yu's evidence, if credited, would tend to show that he did not know that bribing an IRS agent was a bad thing to do, which is not a prohibited ground of departure.

For the very reasons that the majority gives, I too suspect that Yu, a tax preparer who has lived in this country for many years, either knew or should have known that the United States does not tolerate taxpayers bribing tax collectors. But unlike the majority, I view that question as a disputed fact. At oral argument, Yu's counsel was asked whether Yu really believed that his conduct was consistent with American norms. The majority notes that "[w]e did not receive an affirmative response," which is true. But neither did we receive a negative response; his attorney simply did not know or was unwilling to say.

I strongly suspect that the district judge would find that despite Korean practices and Yu's cultural differences, Yu knew or should have known that what he was doing was wrong and therefore is not entitled to

5. Presumably courts would grant requests for departure based on punishment outside of the legal system only extremely rarely. The only such departure of which I am aware is the extraordinary case of former United States District Judge Robert Aguilar, who received a downward departure because the revelation that he accepted bribes was leading to protracted nonjudicial proceedings that were expected to culminate in his removal from office. See *United States v. Aguilar*, Cr. No. 89–0365 (N.D.Cal. 1990) (transcript of November 1, 1990 sentencing hearing). As the district judge recognized in *Aguilar*, however, convictions typically lead to social ignominy and professional ruination. Obviously most offenders' convictions significantly sully their reputations with their friends, neighbors, and colleagues. Their business relations may suffer as well. Thus only the most unusual cases of extralegal punishment, whether culturally related or not, could warrant departure.

6. Because the issue of cultural differences is recurring and involves difficult policy questions, I hope that the opinions in this case will spur the Commission to consider it. To clear up the confusion in the courts, the Commission should adopt a specific Policy Statement on the subject or make clear in some other way when, if ever, factors related to cultural differences may be grounds for departure.

a downward departure. But I would leave the factfinding and the decision whether to depart up to the district court in the first instance. Under the current sentencing regime, the district courts, not the courts of appeals, are charged with finding facts and making the primary decision whether a departure is appropriate. If the district court exercises its discretion to depart, this court can review for abuse of discretion. If the district court declines to exercise its discretion to depart, this court has no jurisdiction to review that decision. *United States v. Denardi,* 892 F.2d 269 (3d Cir.1989). Either way, however, the district court should have the opportunity to exercise its discretion.

In sum, because the Sentencing Commission has not (thus far) foreclosed departure on grounds of this sort of cultural difference, and because the district court should have the opportunity to evaluate the evidence and exercise its discretion to decide whether to depart, I would vacate the judgment of sentence and remand for resentencing. I therefore respectfully dissent.