In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2169

United States of America,

Plaintiff-Appellant,

v.

Maira Bernice Guzman,

Defendant-Appellee.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98 CR 40027--Joe B. McDade, Chief Judge.

Argued November 8, 1999--Decided January 3, 2001

 Before Posner, Ripple, and Diane P. Wood, Circuit
Judges.

 Posner, Circuit Judge.  The government appeals
from a 25-level downward departure granted the
defendant by the sentencing judge because of the
defendant's "cultural heritage," which is Mexican
(she is a citizen of Mexico, not of the United
States) and because her conviction of a serious
drug offense makes her deportable. She had
pleaded guilty to participating in a conspiracy
to distribute methamphetamine. Had the judge not
granted the downward departure of which the
government complains, the defendant's sentencing
range would have been 57 to 71 months in prison.
After making the departure, the judge sentenced
her to time served (three days) plus six months
of home detention plus an additional two and a
half years of supervised release.

 The other participants in the conspiracy were
two men, one of whom was the defendant's
boyfriend, also a Mexican. Her role in the
conspiracy was to help him. The presentence
report recommended a downward departure for her
(though it did not recommend a specific number of
offense levels to depart downward by) because
Mexican cultural norms dictated submission to her
boyfriend's will. Moreover, she had taken up with
him in defiance of her family's wishes and it
would have been humiliating for her to break with
him and return to her family--especially since

she was pregnant with his child, yet they were not married.

The government argues that a defendant's cultural heritage can never be a basis for a downward departure. It points to section 5H1.10 of the Sentencing Guidelines, which provides that "race, sex, national origin, creed, religion, and socio-economic status" (income, education, and other indicia of status) "are not relevant in the determination of a sentence." The Sentencing Commission adopted this guideline under Congress's direction that the guidelines be "entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." 28 U.S.C. sec. 994(d). There is no illuminating legislative history, and no case in this court on whether "cultural heritage" should be subsumed under any (perhaps a combination) of the factors expressly excluded by section 5H1.10 from the sentencing judge's consideration. Two circuits have held that it should be. United States v. Contreras, 180 F.3d 1204, 1212 n. 4 (10th Cir. 1999); United States v. Sprei, 145 F.3d 528, 536 (2d Cir. 1998). Several other circuits, while expressing queasiness at allowing sentencing judges to consider a characteristic that overlaps so closely with national origin, have left open the question whether it may ever be considered but have declined to hold that it may never be. See United States v. Tomono, 143 F.3d 1401, 1404 and n. 2 (11th Cir. 1998); United States v. Yu, 954 F.2d 951, 954 (3d Cir. 1992); United States v. Natal-Rivera, 879 F.2d 391, 393 (8th Cir. 1989). Some Eighth Circuit cases, United States v. Decora, 177 F.3d 676, 679 (8th Cir. 1999); United States v. One Star, 9 F.3d 60, 61 (8th Cir. 1993), and United States v. Big Crow, 898 F.2d 1326, 1331-32 (8th Cir. 1990), allow a cultural factor, specifically, having grown up on an Indian reservation, to be used in sentencing, but they do so without consideration of its compatibility with section 5H1.10, the government apparently not having argued its incompatibility in those cases.

There is considerable force to the government's argument, though precisely how much we need not decide today. Although culture or, as we think it more precise to say, ethnicity is not specified in the guideline or in the statutory provision that compelled it, this may well have been because the drafters thought that the exclusions that are listed encompass ethnicity. To put it differently, the exclusions might unravel if ethnicity were an admissible consideration in sentencing. Race, for example, means rather little apart from the cultural characteristics that often are correlated with it. National origin is also often correlated with ethnicity

and so for that matter is religion, see United States v. Sprei, supra, 145 F.3d at 536, and, as we'll see, gender; and likewise socioeconomic status, which to a great extent is a function of one's upbringing and therefore shaped by the culture--the ethnicity--of one's parents. A judge who wanted to give a break to a black defendant, or a woman, or a Muslim, or a Colombian would have no difficulty pointing to ethnic characteristics that distinguished the defendant from a white male whose ancestors had come to America on the Mayflower. Congress and the Sentencing Commission did not want judges to have such leeway, which would inject enormous subjectivity and variance into a sentencing scheme designed to achieve reasonable objectivity and uniformity.

There is also tension well illustrated by this case between recognizing cultural heritage as a factor warranting a downward departure and the guidelines' provision for a downward departure for a defendant whose role in the crime was minor, U.S.S.G. sec. 5H.7, and their disapproval of a downward departure based on family relationship. sec. 5H1.6. Guzman received a minor-participant departure, which she is seeking to multiply by the cultural-heritage route. And she argues for a cultural-heritage departure in part on the basis of her relationship with her family, which she argues prevented her from leaving her criminal boyfriend; in so arguing she is seeking to get around section 5H1.6.

This is not to deny the possibility of a causal relation between ethnicity and a recognized basis for a downward departure. It just might be the case that because of some ethnic factor a defendant's participation was smaller than it would otherwise have been--for example, by reason of being of a different ethnic background from that of his coconspirators the defendant might not have been entrusted with more than a very minor role in the conspiracy. But the judge's focus properly would be on the extent of the defendant's participation, not on the ultimate (which might be ethnic) causes of that extent. So ethnicity can play a causal role in relation to other departure factors and it can also be another name for characteristics that the guidelines forbid consideration of. In neither class of cases is it properly used as an independent ground for a departure.

We are concerned about the danger that recognizing cultural heritage as an independent ground for departure presents both of perpetuating stereotypes and (though not of great moment in a drug case) of stripping whole classes of potential crime victim of the full protection

of the law. One can imagine, in a case in which the defendant had murdered a homosexual, the defendant's lawyer pleading for a downward departure on the ground that the defendant had been culturally sensitized to believe that a sexual overture from another man was a lethal challenge to his masculinity. Or a case in which the defendant tried to blame a revenge killing on his Balkan heritage, with its tradition of the blood feud. In a case in which the defendant had beaten his wife for talking back to him, one can imagine an argument that the defendant was predestined to such conduct by his Latin heritage of patriarchal values. Women such as the defendant in this case are not acknowledged to possess autonomy equal to that of men when their cultural heritage is used to deny their power of free choice. There is also the anomaly that a Mexican-American born in this country might be allowed to plead ethnicity, whereas one who had immigrated recently to the United States would be barred by the national-origin provision of the guideline. We cannot see what sense that distinction would make.

 Although for these reasons we lean to the view that section 5H1.10 of the guidelines does forbid consideration of ethnicity or "cultural heritage" in the sentencing decision, we need not so hold today and by doing so exclude all possibility of consideration of cultural factors in cases that we cannot yet foresee. (Dissenting in United States v. Yu, supra, Chief Judge Becker suggested a hypothetical case in which the defendant can anticipate severe private punishment from his ethnic community on top of whatever punishment the legal system metes out. 954 F.2d at 959. We needn't try to wrestle such a case to the ground today--it may not even ever arise.) It is enough in order to decide this case to note that the sentencing judge abused his discretion in granting this defendant a downward departure (let alone one of 25 levels) on the basis of her cultural heritage. What the district judge regarded as a matter of cultural heritage is just the joinder of gender and national origin, two expressly forbidden considerations in sentencing. Because the defendant is a Mexican woman, she may have been more likely to participate in her boyfriend's criminal activity than if she had been an Anglo male. To use that as a basis for a departure would wreak havoc with section 5H1.10. The Sentencing Commission could not have wanted sentencing courts to pile on the stereotypes by combining forbidden categories, so that while forbidden to consider sex or race or religion the judge could for example give a break to the defendant because she was a black woman of the Muslim faith.

It remains to consider the other ground for a downward departure, the fact that the defendant is a deportable alien. The judge did not explain his reasoning, but the defendant's lawyer had argued that deportation is a form of punishment and therefore a given sentence imposes greater punishment on a deportable alien than on a citizen. This is wrong. It implies that any alien who commits a crime should receive a shorter sentence than a citizen. Such a rule would invite aliens who did not want to live in the United States to come here to commit crimes. The "double punishment" argument has been rejected in the double-jeopardy setting, United States v. Yacoubian, 24 F.3d 1, 9-10 (9th Cir. 1984), and we now join the courts that have held that it should equally be rejected in sentencing. United States v. Tejeda, 146 F.3d 84, 88 (2d Cir. 1998) (per curiam); United States v. Leandre, 132 F.3d 796, 808 (D.C. 1998); United States v. Alvarez-Cardenas, 902 F.2d 734, 737 (9th Cir. 1990). But this leaves the possibility also argued by the defendant that the status of being a deportable alien can affect the conditions of imprisonment, can make them harsher by disentitling a defendant to serve any part of his sentence in a halfway house, minimum security prison, or intensive confinement center, United States v. Restrepo, 999 F.2d 640, 642-43 (2d Cir. 1993), so that the same nominal prison sentence would be, quite apart from the sequel of deportation, a more severe punishment than if the defendant were a citizen.

 Although several cases hold that since these are congressionally required or desired incidents of deportation, a downward departure motivated by them would undermine legislative policy, id. at 645-46; United States v. Veloza, 83 F.3d 380, 382 (11th Cir. 1996), overruled on other grounds, United States v. Campbell, 181 F.3d 1263 (11th Cir. 1999) (per curiam); United States v. Nnanna, 7 F.3d 420, 422 (5th Cir. 1993) (per curiam), our court, and likewise the D.C. Circuit, have held them to be a permissible basis, in exceptional circumstances, for a downward departure. United States v. Farouil, 124 F.3d 838, 845-47 (7th Cir. 1997); United States v. Smith, 27 F.3d 649, 654-56 (D.C. Cir. 1994); cf. United States v. Davoudi, 172 F.3d 1130, 1133-34 (9th Cir. 1999). But we emphasize that the defendant's status as a deportable alien is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense. The district judge remains free to consider this possibility on remand, though obviously it would not justify a downward departure of 25 levels. Double-digit

departures are reserved for truly exceptional cases, and the differences in the conditions of confinement or other incidents of punishment between deportable aliens and other citizen (or nondeportable alien) defendants, set forth in the cases we have cited, are not great. Smith points out that to a large extent those differences reflect factors, such as flight risk, that would not warrant a downward departure at all. 27 F.3d at 655.

We further remind that when basing departures on factors not explicitly considered by the Sentencing Commission, a judge is to strive to remain within the conceptual universe of the guidelines, moving by analogy from its explicit provisions and stated objectives to the novel situation presented by the case before him. United States v. Koon, 518 U.S. 81, 96 (1996); United States v. Sherman, 53 F.3d 782, 789 (7th Cir. 1995).

The sentence is vacated and the case returned to the district court for resentencing in conformity with this opinion.

Reversed and Remanded.

RIPPLE, Circuit Judge, concurring in part, dissenting in part. Ms. Guzman sought a downward departure from the applicable sentencing range because she claimed that her Mexican cultural heritage required submission to her boyfriend's will, especially in light of the fact that she was carrying his child and that her relationship with him defied her family's wishes. My colleagues reject Ms. Guzman's arguments as if she seeks nothing more than a departure based on her sex and national origin, two "forbidden" factors under U.S.S.G. sec. 5H1.10. Furthermore, they question whether cultural heritage can ever be a basis for a departure, slip op. at 3-5, although their discussion on this point seems superfluous given their conclusion that the facts presented here do not require them to reach this ultimate question, slip op. at 5 ("It is enough in order to decide this case to note that the sentencing judge abused his discretion in granting this defendant a downward departure (let alone one of 25 levels) on the basis of her cultural heritage.").

I write separately because I believe that, in order to determine the propriety of Ms. Guzman's proposed departure, we must first answer the antecedent question: whether cultural heritage can be a basis for departing from an otherwise

applicable sentencing range. As set forth below, I believe that cultural heritage has a meaning distinct from the "forbidden" factors set forth in sec. 5H1.10, whether taken individually or in combination. Furthermore, the Commission has stated explicitly that, with the exception of the factors listed in sec. 5H1.10,/1 it "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." 2000 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b). For these reasons, I cannot but conclude that the guidelines permit a district court to consider cultural heritage as a basis for a downward departure in the unusual case. Indeed, in light of the Commission's silence, and in the absence of other evidence of the Commission's or Congressional intent, judicial elimination of "cultural heritage" as a possible basis for departure would usurp the unique legislative function served by the Commission.

1.
a.

 Although I disagree with my colleagues' conclusion, I recognize that the resolution of the issue before the panel is not straightforward. The issue of how to treat "cultural heritage" under the guidelines is made more difficult by the relatively meager discussion of the subject by the cases that have addressed it./2 For instance, the Eighth Circuit has held that Congress has the authority, as a constitutional matter, to forbid consideration of a defendant's cultural background in sentencing and that a district court does not violate the constitutional rights of the defendant by refusing to take this factor into account in sentencing a defendant. See United States v. Natal-Rivera, 879 F.2d 391, 393 (8th Cir. 1989). Nevertheless, that circuit has recognized that a sentencing court may take into consideration the "unusual mitigating circumstances of life on the Indian reservation." United States v. Decora, 177 F.3d 676, 679 (8th Cir. 1999); United States v. One Star, 9 F.3d 60, 61 (8th Cir. 1993). Two circuits have commented on the difficulty of taking into consideration cultural differences while avoiding the forbidden factor of national origin. The Eleventh Circuit has noted that "considering any 'cultural differences' attributable solely to a defendant's country of origin comes uncomfortably close to considering the defendant's national origin itself, in contravention of the guidelines." United States v. Tomono, 143 F.3d 1401, 1404 n.2 (11th Cir. 1998). The Third Circuit similarly has acknowledged the difficulty in distinguishing between certain cultural differences and the

Congressionally-forbidden criterion of national origin. See United States v. Yu, 954 F.2d 951, 954 (3d Cir. 1992). Although suggesting in dicta that it was "doubtful at best" that district courts ought to be allowed to consider cultural differences under the guidelines, id. at 954 n.2, the court also noted that "it is conceivable that an unschooled recent immigrant or a foreign traveler might reasonably point to practices in his country of origin that would justify a downward departure on the grounds that while he intended to do the acts for which he was convicted and was thus criminally liable, he did not recognize the extent of his culpability in this country." Id. at 954. The majority did not reach the question of whether cultural heritage might be a factor in sentencing; however, now-Chief Judge Becker, writing in dissent, reached this issue and wrote that cultural heritage and national origin are different. See id. at 957-59 (Becker, J., dissenting); see also Tomono, 143 F.3d at 1405 (Roney, J., dissenting) (following Chief Judge Becker's dissent in Yu).

b.

 Legislative materials other than the text of the guideline offer little guidance as well. The concept of cultural heritage is not discussed in the guidelines' enabling statute, that statute's legislative history, or in the guidelines themselves. As Chief Judge Becker wrote in Yu, it seems clear that U.S.S.G. sec. 5H1.10--the section prohibiting the consideration of race and national origin--was based on Congress' directive to the Commission in 28 U.S.C. sec. 994(d) that the guidelines and policy statements be "entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." 28 U.S.C. sec. 994(d).

 The legislative history of this section does not offer much further explanation:

Subsection (d) contains a specific provision that the Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socio-economic status of offenders. The Committee added the provision to make it absolutely clear that it was not the purpose of the list of offender characteristics set forth in subsection (d) to suggest in any way that the Committee believed that it might be appropriate, for example, to afford preferential treatment to defendants of a particular race or religion or level of affluence, or to relegate to prisons defendants who are poor, uneducated, and in need of education and vocational training.

S. Rep. No. 98-225, at 171 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3354 (quotation marks and footnotes omitted). This directive does not require the Commission to prohibit consideration of a defendant's cultural heritage, nor has the Commission chosen to do so.

c.

Although legal sources directly associated with the guidelines offer no definitive guidance on the matter, it is clear that neither the law nor other disciplines have considered the concepts of cultural heritage and national origin to be coterminous. Chief Judge Becker wrote:

[I]f we must take a plain language view of the matter, it seems plain to me that cultural and national origin distinctions are not the same. Many Chicanos are American-born but have a distinct culture. A foreign-born person may have moved here as a child and have no noticeable cultural differences.

Yu, 954 F.2d at 958 (Becker, J., dissenting). Chief Judge Becker's analysis is supported by other legal sources, which define cultural heritage as a set of behavioral characteristics and therefore significantly dissimilar from the immutable characteristics of race and national origin. For instance, Oregon's child care regulations provide a definition of cultural heritage that focuses on behavior./3 Legal commentators have explained that cultural heritage is a social construct, not a characteristic of birth./4

Even when it is not specifically defined, the term cultural heritage stands apart from the terms race and national origin. Several states, including Maryland, Massachusetts, Ohio, and Washington, separate cultural heritage from race and national origin in their regulations governing child custody and placement./5 Each of these states has case law holding that a regulation should be interpreted to avoid rendering superfluous any of its terms./6

Academic literature from other disciplines on the subject of cultural heritage explains that cultural heritage is manifested through behavior. The seminal anthropological definition of "culture" was written by Sir Edward Burnett Tylor./7 Tylor's definition focuses on acquired societal characteristics. In his book Primitive Culture, first published in 1871, Tylor wrote:

Culture or civilization, taken in its wide ethnographic sense, is that complex whole which includes knowledge, belief, art, morals, law, custom, and any other capabilities acquired by

man as a member of society.

Id. at 1. More recently, Melville J. Herskovits wrote that culture is a learned trait, not an immutable one. See Melville J. Herskovits, Man and His Works 17 (1967) ("There is general agreement that culture is learned[.]"). Further, Herskovits explicitly distinguished culture from national origin:

Race, nationality, language, and culture are in actuality independent variables. They meet only in the persons of given individuals who belong to a particular race, are citizens of a specific nation, speak a certain language, and live in accordance with the traditions of their society.

Id. at 149. Moreover, Richard D. Alba, in Ethnic Identity: The Transformation of White America (1990) writes that "[e]thnic culture embraces the patterned, commonplace actions that distinguish members of one ethnic group from another, including food, language, and holiday ceremony." Id. at 76. In the same vein, Milton M. Gordon, writing in Assimilation in American Life (1964), has said that "[c]ulture, as the social scientist uses the term, refers to the social heritage of man--the ways of acting and the ways of doing things which are passed down from one generation to the next, not through genetic inheritance but by formal and informal methods of teaching and demonstration." Id. at 32. Larry L. Naylor, in Culture and Cultural Groupings, in Cultural Diversity in the United States (Larry L. Naylor, ed., 1997), notes that "[t]raditionally, anthropologists have used culture to describe groups of people inhabiting certain geographical areas who share beliefs, behaviors, customs, or a total way of life." Id. at 7.

 Because an individual's cultural heritage encompasses a set of beliefs and a manner of behavior that exist conceptually and practically quite apart from that individual's immutable sex, race or national origin, I believe that cultural heritage should not be considered a prohibited basis for departure under the wording of the current guideline. Indeed, nowhere in the guidelines does the term cultural heritage appear; it is thus best categorized as what the Supreme Court has described as an unmentioned factor. See Koon v. United States, 518 U.S. 81, 96 (1996). Reliance on unmentioned factors is not absolutely prohibited, see United States v. Meza, 127 F.3d 545, 548-49 (7th Cir. 1997); instead, a court must look at what circumstances might justify a departure based on a defendant's cultural heritage.

2.

To determine whether a departure based on an unmentioned factor is appropriate in a particular case, the sentencing court must consider both specific relevant guidelines and the structure of the guidelines as a whole. See Koon, 518 U.S. at 96; United States v. Raimondi, 159 F.3d 1095, 1101 n.16 (7th Cir. 1998); United States v. Schulte, 144 F.3d 1107, 1109 (7th Cir. 1998). Now-Chief Judge Flaum has written for this court:

[A] departure based on an unmentioned factor is appropriate only in the limited situations in which the proposed factor places a case outside the heartland of cases contemplated by both the specific, relevant guideline(s) and the Guidelines as a whole. The Sentencing Commission views this departure power as quite limited and expects "that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.'"

Schulte, 144 F.3d at 1109-10 (citations omitted).

Like many of the "specific offender characteristics" listed in Chapter 5, part H of the guidelines, cultural heritage is not ordinarily relevant in the computation of a sentence; it would justify a departure only if it were present to an extraordinary degree. Moreover, "if a defendant [were to seek] a departure nominally based upon 'cultural differences' that [was] in reality based on personality characteristics of the sort listed in U.S.S.G. sec.sec. 5H1.1 to 5H1.6 and 5H1.11, departure [would be] ordinarily (but not always) improper because the Commission has said in those guidelines that those factors 'are not ordinarily relevant' in departure determinations." Yu, 954 F.2d at 958-59 (Becker, J., dissenting).

Because it is an unmentioned factor that is related to, although not coterminous with, discouraged factors, a defendant's cultural heritage must have been an extraordinary influence to justify a departure. The influence must have been strong enough to place the defendant's situation outside the heartland of cases in which a defendant's personal characteristics might be expected to influence behavior. District courts must be extremely circumspect in their reliance on this factor and thoroughly justify any departure granted on this basis. As noted by my colleagues, although cultural heritage is different from race or national origin, the two are often linked. See Yu, 954 F.2d at 958 (Becker, J., dissenting). Defendants, therefore, might ask for departures based on factors they describe as relating to their cultural heritage that in reality derive solely from their race or national origin. A

sentencing court granting a departure on the basis of cultural heritage therefore would need to explain why the departure was grounded in the defendant's culturally acquired behavioral characteristics rather than sex, race or national origin. Careful scrutiny by the sentencing courts is necessary to ensure that no downward departures conflict with the mandate of U.S.S.G. sec. 5H1.10. It also would be possible for a defendant to assert a basis for departure that would be so contrary to the values protected by the criminal statute that he had violated, or so contrary to public morals, that no departure ought to be allowed.

3.

 The question remains, then, whether using cultural heritage as a basis for a downward departure was appropriate in the present case. The district court's explanation of why it relied on Ms. Guzman's cultural heritage in departing is not extensive. Indeed, given the analysis that a sentencing court must employ in determining whether to depart based on a disfavored factor, I believe the district court's discussion in the present case is inadequate. Therefore, I would remand this matter to the district court to reconsider its decision to depart in light of the principles outlined above. Although I believe that the district court correctly found that cultural heritage is a permissible basis for departure, I believe it appropriate for the court to reconsider its decision and to explain in more detail any departure that it deems appropriate. Furthermore, any departure must be tied to the structure of the guidelines.

Conclusion

 I do not believe that the Sentencing Guidelines, as presently written, forbid a district court from considering a defendant's cultural heritage as a basis for departing from the guidelines under the appropriate circumstances. Therefore, I cannot join that portion of the panel's opinion that reaches a contrary conclusion. With respect to the other issues raised in this appeal, namely whether the district court properly exercised its discretion concerning Ms. Guzman's deportability and the degree to which it departed from the applicable guideline range, I join the panel opinion.


/1 In addition to those listed in sec. 5H1.10, the Commission also identified other factors "that the court cannot take into account as grounds for departure," 2000 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b), such as lack of guidance as a

youth, see sec. 5H1.12, and chemical dependence, see sec. 5H1.4; those additional factors, however, are not relevant to the present case.

/2 See, e.g., United States v. Contreras, 180 F.3d 1204, 1212 n.4 (10th Cir.), cert. denied, 528 U.S. 904 (1999); United States v. Sprei, 145 F.3d 528, 536 (2d Cir. 1998).

/3 Oregon's definition distinguishes cultural heritage from race or national origin: "'Cultural heritage' means the language, customary beliefs, social norms, and material traits including, but not limited to the dress, food, music and dance of a racial, religious or social group that is transmitted from one generation to another." Or. Admin. R. 413-070-0010 (1998).

/4 See Rachel F. Moran, What if Latinos Really Mattered in the Public Policy Debate?, 85 Cal. L. Rev. 1315, 1338-40 (1997); Juan F. Perea, Democracy & Distrust: An Essay on American Languages, Cultural Pluralism, and Official English, 77 Minn. L. Rev. 269 (1992).

/5 See Md. Regs. Code. tit. 7, sec. 02.25.06A(5) (2000) ("A local department shall select and maintain as foster parents, individuals who have the following characteristics: . . . The capacity to value, respect, appreciate, and educate a child regarding the child's racial, ethnic, religious, and cultural heritage . . . ."); Mass. Regs. Code tit. 102, sec. 1.03 (1999) ("The licensee shall not discriminate in providing services to children and their families on the basis of race, religion, cultural heritage, political beliefs, national origin, marital status, sexual orientation, or disability."); Ohio Admin. Code sec. 5101:2-7-09(B) (1999) ("A foster caregiver shall not discriminate in providing care and supervision to foster children on the basis of race, sex, religion, or cultural heritage."); Wash. Admin. Code sec. 388-73-216(3) (1999) ("Child-placing agencies shall consider the racial, ethnic, and cultural heritage needs of the child being placed. At the same time, the agency shall prevent discrimination on the basis of race, color, or national origin against any of its clients.").

/6 Maryland and Massachusetts both have held explicitly that regulations should be interpreted to avoid finding any redundancy in their language. See Chesapeake Indus. Leasing Co. v. Comptroller of the Treasury, 628 A.2d 234, 240 (Md. 1993); Emerson Hosp. v. Rate Setting Comm'n, 563 N.E.2d 681, 683 (Mass. 1990). Ohio has applied this canon of construction to statutes, see State ex rel. Bohan v. Industrial Comm'n, 70 N.E.2d 888, 889 (Ohio 1946), and appears to apply

it to agency rules, see State ex rel. R. Bauer & Sons Roofing & Siding, Inc. v. Industrial Comm'n of Ohio, 701 N.E.2d 995, 999 (Ohio 1998) (per curiam) (applying this canon to the Industrial Commission's rules). Courts in Washington also apply the canon to agency regulations. See Aponte v. Department of Social & Health Servs., 965 P.2d 626, 632 (Wash. Ct. App. 1998) (citing Cox v. Helenius, 693 P.2d 683, 686 (Wash. 1985) (en banc)).

/7 See William A. Haviland, Cultural Anthropology 30 (7th ed. 1993) ("The culture concept was first developed by anthropologists toward the end of the nineteenth century. The first really clear and comprehensive definition was that of the British anthropologist Sir Edward Burnett Tylor."); A.L. Kroeber & Clyde Kluckhohn, Culture 85 (1952) ("Tylor's definition . . . has been, and continues to be, quoted numberless times[.]").