

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-28-2009

# USA v. Daniel Luna

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-3514

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Daniel Luna" (2009). *2009 Decisions*. Paper 1290.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1290

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3514
_____

UNITED STATES OF AMERICA

v.

DANIEL LUGO LUNA,

Appellant.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. No. 06-cr-316-09)
District Judge:  Honorable Gustave Diamond

_____

Submitted Under Third Circuit LAR 34.1(a)
May 20, 2009

Before:   FUENTES, JORDAN, and NYGAARD, *Circuit Judges*.

(Filed: May 28, 2009)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Daniel Lugo Luna appeals his conviction and sentence for distribution of, and

conspiracy to distribute, cocaine.  For the following reasons, we will affirm.

## I.  Background

On September 13, 2006, a federal grand jury in the Western District of Pennsylvania returned a 93-count drug-conspiracy indictment against ten defendants, including Luna and his father, Juan Gutierrez, both of whom are Mexican nationals living in the United States.  The conspiracy involved a supplier from Chicago, Reyes Bautista, selling cocaine to two Pittsburgh-based dealers, Val Byrd and Gregory Sayles, who were then to distribute the cocaine to other local dealers.  Count One charged Luna with conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and Count Two charged him with distribution and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2(a).

Luna was tried before a jury beginning on May 6, 2008.[1]  During Luna's trial, the government proffered evidence that Luna had introduced various members of the conspiracy to one another, attended meetings at which details of the drug transactions were discussed, housed Bautista at his residence when Bautista came to meet Byrd and Sales, permitted three kilograms of cocaine to be stashed in his home, went with Bautista to a nearby Wal-mart to purchase grease, tape, and other materials that Bautista used to

---

[1]He was tried with one other defendant.  The other eight, including his father, pleaded guilty.

mask the scent of cocaine on the money he had received for the cocaine, and received $500 from Bautista.

The parties presented differing accounts of whether Luna was present for Bautista's only successful transaction with Sayles or Byrd, which occurred on October 17, 2005. Luna's roommate, Melissa Schenker, testified for the defense that, sometime in October 2005, she, Luna, Luna's fiancée, and Luna's father traveled from Pittsburgh to McKeesport, Pennsylvania. According to Schenker, Luna spent approximately 30 to 45 minutes together with her and with his fiancée dining at an "Eat'n Park" restaurant while Luna's father went to the hospital, purportedly to visit a sick friend.

Bautista testified for the government that, on October 17, he, Luna, Luna's father, Luna's fiancée, and Schenker drove to McKeesport and parked in a lot across from the McKeesport Hospital. The women, according to Bautista, walked to a nearby Eat'n Park. The three men met Sayles at a bar next door to the hospital and, while Bautista, Luna's father, and Sayles conducted negotiations, Luna sat on a bench outside of the hospital to keep an eye on the vehicle, which contained the cocaine. When Bautista, Luna's father, and Sayles returned, Luna began walking towards the Eat 'n Park, and the other three men drove to Sayles's house to complete the transaction. Agent Andrew Toth of the Pennsylvania State Attorney General's Office, who was conducting surveillance of the transaction, provided an account similar to Bautista's, except he testified that Luna

3

remained seated on the hospital bench even after Bautista, Luna's father, and Sayles left the vicinity and made their way to Sayles's home, where the transaction was completed.

In the midst of deliberations, the jury asked to see Schenker's testimony, Bautista's testimony about the Eat 'n Park, and any other testimony regarding the Eat 'n Park. The District Court agreed to provide the testimony but, over Luna's objection, gave it to the jury as the court reporter produced it, instead of all at once. The jury first received Schenker's testimony and then Bautista's, but, before Toth's testimony was available, it reached a verdict: Luna was found guilty on both counts.[2]

The U.S. Probation Office calculated Luna's offense level as 30, which, coupled with a criminal history category of I, yielded a Guidelines sentencing range of 97 to 121 months, narrowed to 120 to 121 months because of the mandatory minimum under 21 U.S.C. § 841(b)(1)(A)(ii). At Luna's sentencing hearing, the government recommended the application of 18 U.S.C. § 3553(f), which would allow the Court to sentence Luna below the mandatory minimum, reduce his offense level to 28, and drop his sentencing range to 78 to 97 months. Luna argued for a variance based on his subservience to his father, who was a central player in the drug conspiracy. Luna's argument centered on the allegedly patriarchal nature of Mexican culture. The Court dismissed that argument as

---

[2]The Court also submitted a special interrogatory concerning the amount of cocaine that Luna conspired to distribute, which it was to answer only if it found Luna guilty of the drug conspiracy charge. The jury found him responsible for conspiring to distribute more than five kilograms of cocaine.

unworthy of serious consideration, accepted the government's sentencing recommendation, and sentenced Luna to 65 months' imprisonment on each count, the terms to run concurrently. It entered a final judgment of conviction and sentence on August 6, 2008, and Luna's timely appeal followed.

## II. Discussion[3]

Luna argues that the evidence offered by the government was insufficient to establish the charges against him or, alternatively, to prove that he was responsible for more than three kilograms of cocaine. He further argues that the Court erred by failing to give the jury all of the transcripts that it requested, and that, in sentencing him, the Court committed procedural error by refusing to consider the patriarchal nature of Mexican culture. All of those contentions lack merit.

### A. Sufficiency of the Evidence

"In reviewing a jury verdict for sufficiency of the evidence, ... we 'must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt.'" *United States v. Lore*, 430 F.3d 190, 204 (3d Cir. 2005) (quoting *United States v. Frorup*, 963 F.2d 41, 42 (3d Cir. 1992)).

---

[3]The District Court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

The essential elements of a drug conspiracy under 21 U.S.C. § 846 are "(1) a shared 'unity of purpose,' (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006) (internal citation omitted). Luna claims that the government failed to establish any of those elements and, because the evidence is insufficient to prove that he had the intent to achieve the "common goal" of cocaine distribution, the same evidence cannot be sufficient to support his conviction for possession with intent to distribute.

The record tells a different story. Confronted with uncontradicted evidence that Luna facilitated and attended meetings where the details of the drug conspiracy were discussed, accommodated the supplier and the supplier's cocaine at his residence, helped the supplier buy materials that would mask whatever cocaine residue lingered on the drug money, and received payment from the supplier, a rational jury surely could determine that, as we put it in *United States v. Cartwright*, 359 F.3d 281, 287 (3d Cir. 2004), there is "a logical and convincing connection" between the established facts and the inference that Luna actively participated in the conspiracy and the distribution.

The record also adequately supports the jury's attribution of more than five kilograms of cocaine to Luna, even though he only participated in a transaction involving three kilograms. Bautista provided uncontradicted testimony that the plan was to traffic ten kilograms of cocaine from Chicago for distribution in Pittsburgh, but that the driver "lost" seven kilograms en route. (App. at 258.) In addition, Sayles indicated that he was

6

supposed to purchase at least five kilograms from Bautista, an account corroborated by transcripts of intercepted phone calls between the two men. Luna cannot benefit from the conspiracy's failure to traffic the intended amount of cocaine, because the government "need not prove that the amounts under negotiation were actually distributed." *United States v. Gibbs*, 190 F.3d 188, 219 (3d Cir. 1999). Sufficient evidence supports the jury's conclusion that Luna participated in the conspiracy to bring at least five kilograms of cocaine into Pittsburgh for the purpose of distribution, regardless of how much cocaine actually arrived.

### B.     Transcript Request

According to Luna, the Court abused its discretion by not completely fulfilling the jury's request for testimony regarding the Eat'n Park.[4] As Luna notes, a trial court may decline a jury's request for written transcripts of trial testimony only upon finding that supplying the transcript will slow the trial or cause the jury to give undue weight to the requested testimony. *United States v. Bertoli*, 40 F.3d 1384, 1400 (3d Cir. 1994). Because the Court made neither finding, Luna argues, it was required to provide the jury with all of the transcripts that it requested.

Of course, as Luna must acknowledge, the Court did not decline the jury's request. Rather, it agreed to supply the transcripts; it provided the relevant testimony of Schenker

---

[4]Luna is correct that we review for abuse of discretion a district court's response to a jury request to review testimony. *See United States v. Bertoli*, 40 F.3d 1384, 1400 (3d Cir. 1994); *United States v. Zarintash*, 736 F.2d 66, 70 (3d Cir. 1984).

7

and Bautista; and it was about to send back the remaining relevant testimony – that of Agent Toth – when the jury announced that it had a verdict. Luna claims, however, that the Court's decision to give the transcripts to the jury piecemeal, instead of all at once, constitutes a *de facto* refusal of the jury's request. Given the Court's demonstrated effort to provide the jury with what it asked for, we disagree.[5]

At the root of Luna's argument, it seems, is an implicit argument that the jury should have considered all of the transcripts it requested before reaching its verdict. But that is not a proper basis for an appeal. As the United States District Court for the District of Massachusetts noted when presented with an argument similar to the one that Luna makes here, once the jurors "retire for their deliberations, they are, functionally, in charge of the pace and manner of future proceedings. When [they] have requested that a portion of the trial transcript be provided to them, nothing prevents them on further consideration from agreeing upon and returning a verdict before receiving it." *Tavares v. United States*, 914 F.Supp. 732, 734 (D. Mass. 1996); *see also United States v. Sanders*, 893 F.2d 122, 138 (7th Cir. 1990) (trial court "did not commit error, let alone reversible error" by responding to the jury's request for recordings and transcripts of trial testimony by

---

[5]Because Agent Toth essentially confirmed Bautista's account of what transpired in McKeesport on October 17, it is difficult to understand why Luna believes that he could have benefitted from the jury's review of Toth's testimony. Even if the Court's method of distributing transcripts constituted an abuse of discretion, it would not require reversal because it would not have "prejudiced [Luna's] trial in any meaningful way." *United States v. Tolliver*, 330 F.3d 607, 617 (3d Cir. 2003).

8

playing tapes first, even though the jury returned its verdict before it received the transcripts).

> ### C. Sentencing Procedure

Luna's final argument – that the Court committed procedural error at sentencing by failing to consider the patriarchal nature of the Mexican family and its impact on his role in the offense – is also unpersuasive. While a district court in setting a sentence must consider the relevant factors listed under 18 U.S.C. § 3553(a), including the characteristics of the defendant, *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (citation omitted), it need not reflect on sentencing arguments that are without factual support or legal merit, *see United States v. Ausburn*, 502 F.3d 313, 329 (3d Cir. 2007).

No legal authority suggests that cultural heritage is a proper ground for a downward sentencing variance. To the contrary, the Sentencing Guidelines advise that a defendant's race and national origin are never relevant for sentencing purposes, U.S.S.G. §§ 5H1.10, and at least three Circuit Courts have concluded that considering a defendant's culture runs afoul of the Guidelines. *United States v. Dyck*, 334 F.3d 736, 743 (8th Cir. 2003); *United States v. Contreras*, 180 F.3d 1204, 1212 n.4 (10th Cir. 1999); *United States v. Sprei*, 145 F.3d 528, 536 (2d Cir. 1998); *see also United States v. Guzman*, 236 F.3d 830, 833 (7th Cir. 2001) ("lean[ing] to the view that [U.S.S.G § 5H1.10] does forbid consideration of ethnicity or 'cultural heritage' in the sentencing

decision"). While the Guidelines were rendered advisory by *United States v. Booker*, 543 U.S. 220 (2005), it is significant that no court since has questioned the wisdom of § 5H1.10 or the courts endorsing it. We see no reason to be the first. The District Court did not commit procedural error by refusing to consider Luna's cultural heritage argument.

## III. Conclusion

For the foregoing reasons, we will affirm the District Court's judgment of conviction and sentence.[6]

---

[6]In his reply brief, Luna accuses the government of violating Third Circuit LAR 28.1(c) by making prohibited *ad hominem* attacks in its brief for the United States. Specifically, Luna objects to the government's attempt to denigrate Connie Acosta, the Federal Public Defender's investigator who reported on the influence that Luna's cultural heritage had on his role in the drug conspiracy, and to the government's use of the defendant's name – ostensibly for humor value – in the following subsection heading: "Luna(cy): The Foiled Attempt At A Shakedown." While those objections have no bearing on our analysis, we agree with Luna that neither the government's characterization of Ms. Acosta nor its wordplay reflect the seriousness of purpose warranted by this case.