**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Chong Won TAI, Defendant–Appellant.**

No. 92–1850.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1992.

Decided April 28, 1993.

Barry R. Elden and Pamela Pepper (argued), Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Charles B. Sklarsky (argued), and Robert R. Stauffer, Jenner & Block, Steven J. Rosenberg, Chicago, IL, for defendant-appellant.

Before MANION and ROVNER, Circuit Judges, and REYNOLDS, Senior District Judge.*

REYNOLDS, Senior District Judge.

Defendant-appellant Chong Won Tai ("Tai") was found guilty of collecting loans by extortionate means in violation of 18 U.S.C. § 894 and of conspiring to commit the same offense. He was sentenced to 204 months of imprisonment and fined $175,000. Tai appeals the conviction on the ground that the district court improperly admitted certain testimony concerning Tai's activities and improperly permitted the government to display certain exhibits during its closing argument. In addition, Tai challenges the district court's sentencing determination.

We affirm the judgment of conviction but conclude that the district court erred with respect to its sentencing determination by

---

* The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, sitting by designation.

failing to articulate the grounds for an offense-level increase under Guideline § 3B1.1 and by failing to justify the extent of an upward departure under Guideline § 4A1.3. For those reasons, we vacate the sentence and remand the case for resentencing.

## I. Trial Record

### A. *Evidence Presented at Trial.*

Tai operated a pawn shop in a Korean community in Chicago. Part of his business involved extending loans at exorbitant interest rates to other members of the community. In December 1989, Tai loaned $20,000 to Suk Kyong Lee ("Suk Lee"), who in turn gave the money to her friend, Jung Hwan Lee ("Jung Lee"), to enable him to purchase a house. When Suk Lee failed to make payments on the loan, Tai, carrying a gun and handcuffs, made threatening statements to her. Subsequently, Tai deposited checks that Suk Lee had given him as collateral; the checks were dishonored. Suk Lee was arrested as a result and spent a night in jail, but the charges against her were dismissed the next day.

In August 1991, Tai attempted to collect payments on Suk Lee's loan from Jung Lee, but he refused to accept responsibility for the loan. As Jung Lee and Tai spoke on this matter, an unidentified man photographed them. In early September 1991, Tai spoke with Steven Song Bak Rim ("Rim"), the advertising director at the newspaper for which Jung Lee worked, about a debt Jung Lee owed Tai. When Rim asked Jung Lee about the debt, Jung Lee denied owing Tai any money. Rim conveyed that response to Tai.

On September 10, 1991, a person who identified himself as David Kim telephoned Jung Lee and expressed an interest in placing advertising in the newspaper. The caller and Jung Lee arranged to meet that evening at a motel. When Jung Lee arrived at the motel, two men bound him and repeatedly stabbed him in the leg with knives. The men eventually left and Jung Lee was able to get help. Jung Lee later identified Jong Kwang Tae ("Tae") as one of the men who attacked him.

On September 11 and 12, in telephone calls recorded by federal authorities, Tai demanded that Jung Lee pay him $20,000, repeatedly threatened to "beat up" or "kill" Jung Lee for not paying, and, according to the government, intimated that he, Tai, was responsible for the attack on September 10. Tai also referred to the fact that he had more than one "follower-guy" who could "teach [Jung Lee] a lesson." On September 12, Rim spoke to Tai about the stabbing when Tai came to the newspaper offices looking for Jung Lee. According to Rim, Tai at first denied any involvement in the stabbing but then acknowledged that it may have been done on his behalf.

Tai introduced expert testimony that the Korean language permits less subtlety in the expression of emotion than does the English language and that, as a result, the English translation of Tai's recorded statements to Jung Lee made them sound much more threatening than they sounded in the original Korean.

Over the objection of Tai's counsel, three government witnesses were permitted to testify as to their own experiences in dealing with Tai, and a fourth was permitted to testify as to Tai's association with certain shady characters. The court ruled that such testimony would serve purposes other than showing Tai's propensity to commit crime, and therefore was not barred by Fed.R.Evid. 404(b).

The first extrinsic act witness, David Kim, testified that in August 1991, Tai came to his store in Michigan and demanded $17,800 to cover the principal, interest, and "penalty" on a $5,000 loan. Tai photographed David Kim at the time and told him that if a payment was not made he would send his "gangs" to collect the money. At Tai's instruction, David Kim was searched by a man later identified as Tae (the person Jung Lee identified as one of the participants in the attack on him). A second extrinsic act witness, Tae Hwan Kim ("Tae Kim"), testified that in August 1991, Tai demanded full payment on a $3,000 loan, threatening to send the two men accompanying him to collect the money. One of those men, later identified as Tae, took from Tae Kim a picture of him and his

wife. Jae B. Lee, a third extrinsic act witness, testified that in August 1989 he went to Tai's office to demand payment for electric work he had performed but was put off by Tai and beaten by one of Tai's associates, later identified as Tae. A few days later, Tai threatened to "send somebody" to Jae Lee's house if he did not finish the work he had started.

The final extrinsic act witness, Wang Gon Hong, testified that on two separate occasions he observed Tai with two fairly intimidating, unfriendly people, one of whom was later identified as Tae.

At the end of the trial, the district court instructed the jury that the testimony of these four witnesses could be used to establish the existence of a conspiracy or association between Tai and Tae. The court further instructed:

> You may consider this evidence ... only on the questions of the defendant's state of mind; motive and intent in committing the charged offenses; the defendant's opportunity, mode or method of operation, and planning in committing the offenses charged; and that the defendant acted knowingly and intentionally and not because of some mistake or accident. This evidence is to be considered by you only for these limited purposes.
>
> The evidence may not be considered by you as proof of the defendant's character and that he acted in conformity therewith. That is, you may not consider this evidence of similar conduct to conclude that because the defendant committed other act or acts he must also have committed the acts charged in the indictment.

(72–6 Tr. at 603–04.) A similar instruction had been given prior to the testimony of one of the extrinsic act witnesses.

On September 27, 1991, two weeks after Tai's arrest, two large guns were found during a search of Tai's shop. At the end of the trial, but prior to closing arguments, the guns were admitted into evidence outside the presence of the jury, along with a stipulation as to where the guns had been found. Tai's counsel did not object to admission of the guns at that point, although he did object, unsuccessfully, to admission of other items found during the search of Tai's shop. As closing arguments were about to begin, however, Tai's counsel asked that the guns not be admitted and that the government be prevented from displaying the guns to the jury. Although the district court said the guns "look like cannons, not guns, to me," it overruled the objection, permitting the government to comment upon and display the guns once during closing arguments. (72–6 Tr. at 533.)

The jury acquitted Tai on the charge that he used extortionate means against Suk Lee, but found him guilty of using and of conspiring to use such means against Jung Lee.

### B. Sentencing.

The district court increased Tai's offense level by four points pursuant to § 3B1.1(a) of the Sentencing Guidelines, based on the conclusion that Tai was the organizer of criminal activity that involved at least five participants or was "otherwise extensive." In support of the increase, the government had identified several people intentionally or unwittingly involved in Tai's loan operation, including the two people who attacked Tai in the hotel, the person who took Tai's picture, the detective who arrested Suk Lee for writing a bad check, the Cook County circuit judge who presided over that charge, and Tai's wife and assorted relatives. When it imposed the offense-level increase, however, the district court identified neither the five participants nor the otherwise extensive activity upon which the increase should have been based. (75–2 Tr. at 124–25.)

This increase, together with other increases not at issue on appeal, resulted in an offense level of 33. That, combined with Tai's single criminal history point, would have resulted in a sentencing range of 135 to 168 months.

The district court, however, departed upward from the guidelines pursuant to § 4A1.3, increasing Tai's criminal history points from one to four. The government had urged a sixteen point departure, citing evidence that Tai's loan operation was widespread, that Tai had been arrested in the past for violent conduct, that he had commit-

ted the instant offense while on bail for another charge, and that he had made threatening telephone calls to his debtors while incarcerated during his trial at the Metropolitan Correctional Center ("MCC"). The district court found that a three-point upward departure was justified because Tai "used the MCC facilities to further the criminal activity for which he [was] convicted." (75–2 Tr. at 127.)

The three-point criminal history departure moved Tai from the first criminal history category to the third. That, together with Tai's 33–point offense level, resulted in a sentencing range of 168 to 210 months. Tai was given 204 months and fined $175,000.

## II. Analysis

A. *Evidentiary Objections.*

■ We review the district court's evidentiary rulings only to determine whether there was an abuse of discretion. *United States v. York*, 933 F.2d 1343, 1352 (7th Cir.), *cert. den.*, — U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991).

1. Extrinsic Act Testimony.

Tai contends that much of the testimony concerning his behavior towards people other than Suk Lee and Jung Lee should have been excluded because it was introduced only to show his propensity for committing extortion or because it went beyond what was necessary to establish the existence of a relationship between Tai and Tae, assuming it was even admissible for that purpose. In addition, Tai claims that the district court erred by instructing the jury that such evidence could be used to prove a number of things that were not in dispute.

Evidence of actions extrinsic to the defendant's alleged crime must initially satisfy Rule 404(b), which requires the exclusion of such evidence if it would be used only "to prove the character of [the defendant] in order to show action in conformity therewith." If, however, the evidence is used for some other purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," it is not barred by Rule 404(b).

The question, then, is whether admission of the extrinsic act evidence against Tai served some purpose other than proving his propensity to commit extortion.

■ Clearly it did. It tended to show that when Tai demanded payment or service from someone, Tae often helped him extract it. That information, combined with the evidence that Tai thought Jung Lee owed him money, was highly probative on the issue of whether Tae's hotel-room attack on Jung Lee was part of Tai's loan-collection efforts. Or, to use the terminology of Rule 404(b), the evidence was admissible as tending to prove Tai's "identity" as the person responsible for the attack on Jung Lee. Essentially the same conclusion was reached in *United States v. Czarnecki*, 552 F.2d 698, 701 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977), also involving a prosecution under 18 U.S.C. § 894, where a witness' testimony that he had previously collected loans for the defendant was held admissible to prove the defendant's identity as the person responsible for ordering the witness to commit extortion on a particular occasion.

■ Typically, the identity exception to Rule 404(b) is invoked to admit evidence of acts so similar to the act underlying the charged offense that the defendant's involvement in one is inferred from his involvement in the other. Louisell and Mueller, 2 Federal Evidence at 269 n. 4 (1985). That was the issue in *United States v. Shackleford*, 738 F.2d 776, 782 (7th Cir.1984), where evidence of the defendant's prior extortionate acts was held inadmissible for the purpose of proving identity because there was not sufficient similarity between those acts and the acts for which the defendant was charged. In this case, likewise, the more elaborate and violent nature of the extortion of Jung Lee distinguishes it somewhat from the extortion of the other extrinsic act witnesses, so their testimony could not have been admitted solely on the basis of the similarity between their experiences and Jung Lee's.

■ But similarity in that sense was not the basis for admitting their testimony. Rather, it was admitted to demonstrate that

Tai employed one of the participants in the attack on Jung Lee and therefore might have been connected with it, much the way evidence of a person's prior possession of a gun found at a robbery site might be admitted to prove the person's involvement in the robbery. *See United States v. Waldron,* 568 F.2d 185, 187 (10th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). In these kinds of cases, where the extrinsic act reveals the defendant's actual control over something involved in the charged act but is not wholly similar to the charged act, the similarity component of the analysis set forth in *Shackleford* cannot determine the admissibility of the evidence. *Czarnecki,* 552 F.2d at 702 (under Rule 404(b), the extrinsic act would have to be similar to the charged act "only if a basis for the relevance of the evidence is similarity.").

▌ In addition to proving identity, there was another valid purpose for admitting most of the extrinsic act evidence against Tai, namely, to prove that Tai's "intent" in using harsh words with Jung Lee was to threaten him. Where specific intent is not an essential element of the crime charged, as in the crime of extortionate loan collection, the government may not introduce extrinsic act evidence to prove intent unless it has reason to believe that the defendant will claim innocent intent. *Shackleford,* 738 F.2d at 781. In this case, the government knew Tai would call an expert witness to testify that his recorded statements to Jung Lee really were not threatening in Korean, the language in which they were spoken, but sounded that way in the English translation because of differences between the two cultures.[1] (Rec. at 51.) By claiming that his comments to Jung Lee were not in fact threatening, Tai put his intent in issue. *Shackleford,* 738 F.2d at 782.

Much of the extrinsic act testimony was probative on this issue because it tended to show that when Tai promised to send someone to collect a debt, as he did in Jung Lee's case, it was perceived as a serious threat, not just idle chit-chat. The content and context of Tai's threats to the extrinsic witnesses were similar enough to his statements to Jung Lee, and near enough in time, to warrant admission.

The next step in assessing the admissibility of extrinsic act evidence is to balance its probative value against any unfair prejudicial effect it may have. *Huddleston v. United States,* 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988); Fed.R.Evid. 403. Tai claims that the testimony concerning his other extortionate acts was unfairly prejudicial because it dealt with certain incidents in which Tae was not directly involved, thus going beyond what was necessary to establish a relationship between the two men. But most of the testimony did concern incidents involving both Tai and Tae, and to the extent it did not, it simply put those incidents in context, as is permissible. *United States v. Townsend,* 924 F.2d 1385, 1415 (7th Cir. 1991). Further, since much of the evidence was relevant to another issue, proof of Tai's intent, it did not need to address only the relationship between Tai and Tae. We conclude that the evidence was not unfairly prejudicial in its scope.

Finally, there is the matter of the district court's instructions to the jury. The instructions identified a number of permissible uses of the extrinsic act evidence, rather than carefully limiting its use to proof of the relationship between Tai and Tae and of Tai's intent to threaten Jung Lee. The jury was instructed that the evidence could also be used to establish Tai's "motive," "opportunity," "mode or method of operation," "planning," and absence of "mistake or accident." But Tai did not claim he had no reason to extort money from Jung Lee, so his motive was not in issue. And he did not claim he was unable to extort the money, so his opportunity was not in issue. Further, although the extrinsic act evidence did perhaps demonstrate Tai's method of committing extortion, that method was not followed to the letter in Jung Lee's case, so, as noted above, the extrinsic acts could not be introduced to show a similarity between Tai's usual method and the extortion of Jung Lee. As for absence of mistake or accident, those things were not in issue because Tai did not try to

---

1. Coincidentally, it turned out that the expert had been one of Tai's debtors. (72–5 Tr. at 485.)

present himself as an innocent, unwitting participant in the extortion conspiracy.

■ The remaining purpose for which the instructions permitted the extrinsic evidence to be used, proof of planning, also was not an appropriate basis for admission. The plan exception to Rule 404(b) applies where the extrinsic act evidence helps explain how the charged offense unfolded or developed, not where the evidence merely indicates that the defendant committed the same crime on other occasions. *United States v. Hill*, 898 F.2d 72, 75 (7th Cir.1990); 2 Federal Evidence at 257. In this case, evidence of Tai's extortion of the extrinsic act witnesses reveals nothing about his plan to commit the same crime against Jung Lee, and therefore was not admissible for that purpose.

■ The instructions were in error to the extent they informed the jury that the extrinsic act evidence could be considered for purposes other than the proper purposes for which it was admitted. *Huddleston*, 485 U.S. at 691–92, 108 S.Ct. at 1502; *Townsend*, 924 F.2d at 1415–16. But we find that the error here was harmless. At worst, the erroneous instructions might have led the jury to decide issues that it did not need to decide, such as whether Tai had a motive for committing extortion. Taken as a whole, however, the instructions did not suggest that the jury could use the extrinsic act evidence as proof of criminal propensity; the district court clearly and carefully instructed the jury that the evidence could not be used for that purpose. Further, the extrinsic act evidence irrefutably established the nature of Tai's relationship to Tae and, through that, his responsibility for the attack on Jung Lee. Thus, used for its permissible purposes, the evidence was more than adequate to prove Tai's guilt beyond a reasonable doubt.

2. Cannons, not Guns.

■ Tai claims the government should not have been permitted to display during its closing argument the two guns found in his store, because the guns were frighteningly large and had no proper bearing on any evidence that had been presented to the jury. The government insists, however, that Tai waived any such argument by not objecting to admission of the guns in a timely manner. We disagree. Tai's objection, though it came after the guns had technically been received into evidence, was made in plenty of time for the court to decide the issue before the jury actually saw the guns and before closing arguments began.

■ Clearly the guns had no proper probative value. Although both Suk Lee and Jung Lee testified that they had seen Tai carrying a gun, neither of them described the gun nor in any way compared it to the guns displayed during closing argument. Thus, as of the time the guns were admitted, no connection had been drawn between Tai's possession of them and his acts of extortion. Nor could the guns have been admitted as conditionally relevant, for no further testimony was to be heard in the case. And, although the government was kind enough to explain, while displaying the guns to the jury, that Tai "carried them when he was with Suk Kyong Lee" (72–6 Tr. at 536), no such evidence had been introduced and closing argument was not the time to introduce it. *United States v. Van Wyhe*, 965 F.2d 528, 533 (7th Cir.1992).

So the guns were relevant only to the extent they showed Tai to be the kind of person who would carry such weapons, thus making it more likely that he was the kind of person who committed extortion. Yet for that purpose, of course, the guns were not admissible. Fed.R.Civ.P. 404(b).

■ Nevertheless, we find that the error in admitting them and in permitting the government to display them was harmless. At the district court's instruction, the guns were displayed and commented upon but once, and then only in passing; they represented an insignificant portion of the government's closing argument. Further, Tai was acquitted of the charge involving Suk Lee, and only with respect to that charge might Tai's possession of a gun have made a difference, for only Suk Lee claimed that Tai carried a gun when he threatened her. Although Jung Lee also had observed Tai carrying a gun on one occasion, he did not claim that Tai threatened him at the time. Rather, the charges involving Jung Lee were based on evidence that

Tai hired others to collect loans. And that evidence, as noted above, established Tai's responsibility for the attack on Jung Lee beyond a reasonable doubt.

B. *Sentencing.*

1. Offense–Level Increase.

■■■ Though acknowledging the district court's failure to articulate the reasons for the challenged offense-level increase, the government insists that sufficient support for the increase can be found in the record. Perhaps so, but it is not this court's role to make the factual findings necessary to support a sentencing calculation; that is a task for the district court. *United States v. Jewel,* 947 F.2d 224, 235 (7th Cir.1991). Because the factual basis for the § 3B1.1(a) increase was not made clear, we must vacate the sentence and remand the case for resentencing. *Id.*

On remand, the issue is likely to arise whether an increase under that section may be based upon conduct outside of the offense for which Tai was convicted, so we address the issue here. The guidelines provide that for purposes of determining offense-level adjustments, relevant conduct includes, "unless otherwise specified," the following:

> (1) ... all acts and omissions ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction.

United States Sentencing Commission, *Guidelines Manual* ("Guideline") § 1B1.3(a) (Nov. 1992).

In *United States v. Tetzlaff,* 896 F.2d 1071, 1074 (7th Cir.1990), these provisions regarding relevant conduct were held not applicable to determinations under § 3B1.1, because that guideline set forth its own standard of relevant conduct, thus falling into the "unless otherwise specified" exception to § 1B1.3(a). Increases under § 3B1.1 are to be "based on the defendant's role in the offense." Guideline § 3B1.1. *Tetzlaff* construed that phrase as referring to the offense "of conviction." 896 F.2d at 1074. The court concluded, therefore, that Tetzlaff should not have received an increase for being an organizer or leader, because although he had been charged for distributing cocaine with other people, his conviction was on a cocaine-possession charge involving only himself. *Id.* at 1072, 1074.

Several months after *Tetzlaff* was decided, however, the Sentencing Commission amended the commentary to § 3B1.1 to make clear that, in its view, the conduct relevant to that guideline included not just the "elements and acts cited in the count of conviction," but "all conduct included under § 1B1.3(a)." Guidelines Part B (Intro.Comm'y). Thus, the new commentary, effective November 1, 1990, rejects this and other courts' prior interpretations of § 3B1.1.

Tai urges us not to take such contrariness lying down. He says the amended commentary should be disregarded because it contradicts the plain language of the guidelines and is weak authority anyway, as Congress has no formal opportunity to review it. *See United States v. Stinson,* 957 F.2d 813, 815 (11th Cir.), *cert. granted,* —— U.S. ——, 113 S.Ct. 459, 121 L.Ed.2d 368 (1992) (refusing to follow commentary that rejected the court's earlier interpretation of § 4B1.2). But the circuit courts that agreed with *Tetzlaff* prior to the commentary amendment, as well as those that had not previously addressed the issue, have since concluded that the amendment should be followed as a permissible clarification of § 3B1.1.[2] This court, too, has held that a commentary amendment prevails

---

2. *See: United States v. Caballero,* 936 F.2d 1292, 1299 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992) (rejecting its previous position that § 1B1.3(a) did not apply to § 3B1.1); *United States v. Lillard,* 929 F.2d 500, 503 (9th Cir.1991) (same); *United States v.*

*Mir,* 919 F.2d 940, 945–46 (5th Cir.1990) (same); *United States v. Saucedo,* 950 F.2d 1508, 1513 (10th Cir.1991) (rejecting its previous position with respect to conduct occurring after the date of amendment); *United States v. Ruiz–Batista,* 956 F.2d 351, 353–54 (1st Cir.), *cert. denied,* ——

over a previous decision to the contrary, as long as the amendment clarifies, but does not substantively change, the applicable guideline. *United States v. Thompson,* 944 F.2d 1331, 1347 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992).

 In this case, however, it is unnecessary to decide whether the amended commentary to § 3B1.1 is a clarification, as it purports to be, or a substantive change, for here we reach the same result under both *Tetzlaff* and the amendment. We conclude that any increase in Tai's offense level based on § 3B1.1(a) must stem only from his organization of the extortion of Jung Lee, and not from his organization of the general loan operation, nor from any actions he took against Suk Lee. These limitations on relevant conduct are clear from *Tetzlaff.* Under § 1B1.3(a), however, we arrive at the limitations in a more roundabout way.

Again, that guideline first requires consideration of "all acts and omissions ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Guideline § 1B1.3(a)(1). "Preparation" for the offense of conviction must be distinguished from actions that are merely similar to or factually related to the offense of conviction, for such actions are covered by another subsection which applies only to a certain category of offenses. Specifically, § 1B1.3(a)(2) makes relevant "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction," but only with respect to offenses to which § 3D1.2(d) is applicable.

That guideline applies if:
the offense level is determined largely on the basis of the total amount of harm or

loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Guideline § 3D1.2(d). Mercifully, the guideline lists the specific offenses to which it does and does not apply. Included in the latter group is extortionate loan collection under 18 U.S.C. § 894, referred to at § 2E2.1. Thus, Tai's offense is not covered by § 3D1.2(d), nor, therefore, by § 1B1.3(a)(2). As a result, any course of conduct or common scheme or plan of which the extortion of Jung Lee was a part cannot be considered in arriving at an offense-level increase under § 3B1.1.[3] As noted above, we arrive at the same result, though in a different way, under *Tetzlaff*'s interpretation of § 3B1.1.

2. Criminal History Departure.

 We review any departure from the guidelines to ensure that the grounds for the departure were appropriate, that the factual findings underlying the departure were not clearly erroneous, and that the extent of the departure was reasonable. *United States v. Connor,* 950 F.2d 1267, 1271 (7th Cir.1991). In this case, the district court departed from the guidelines pursuant to § 4A1.3 by increasing Tai's criminal history points from one to four based on evidence that Tai had continued his extortionate activities while incarcerated at the MCC pending the instant trial. Tai does not contend that the district court's findings with respect to the MCC activity were clearly erroneous, nor that such activity was an improper ground for departure.[4] Rather, Tai's position is that the extent of the departure was unreasonable.

 If the defendant's criminal history category is found not to adequately reflect the seriousness of his past crimes or the

U.S. —, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992) (finding the amendment to be a reasonable clarification of § 3B1.1); *United States v. Perdomo,* 927 F.2d 111, 117 (2nd Cir.1991) (same).

3. The opposite would have been true in *Tetzlaff,* had the court found § 1B1.3 applicable, because the offense of conviction in that case, cocaine possession in violation of 21 U.S.C. § 841(a)(1), is covered under § 3D1.2(d). *See United States v. Fells,* 920 F.2d 1179, 1184 (4th Cir.1990), *cert.*

*denied,* — U.S. —, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991).

4. Although Tai claims that the court may have relied on various other grounds in addition to the MCC activity, the record does not support that claim, so we will not consider whether those grounds would have been appropriate. (72–5 Tr. at 127.) We note that the MCC activity was a proper ground for departure because the guidelines do not take into consideration the effect of conduct (other than obstruction of justice) occur-

likelihood of his committing future crimes, the district court may depart from the otherwise applicable guideline range. Guideline § 4A1.3 (Policy Statement). To do so, the court must identify the factors in the defendant's criminal history that the guidelines did not take into account and that are proper grounds for departure. Then, the court must explain why those factors make the defendant's criminal history more comparable to criminal histories found in a higher category than to those found in the defendant's category. *United States v. Miller,* 874 F.2d 466, 470–71 (7th Cir.1989). In effect, this requires the district court to assign some value to each ground for departure; in that regard, guideline provisions dealing with analogous factors should be considered. *United States v. Ferra,* 900 F.2d 1057, 1062–63 (7th Cir.1990). The sentence that is ultimately chosen must fall within the guideline range applicable to whichever higher criminal history category best represents the defendant's criminal history. *Miller,* 874 F.2d at 470.

In this case, the district court identified an appropriate ground for departure and picked a sentencing range from a higher criminal history category, but left out the intermediate step of explaining why the MCC activity made Tai's criminal history more comparable to that of defendants in the higher category. The government asks us to accept its own explanation for the extent of the departure, and Tai asks us to reject that explanation as unreasonable.[5] But we will do neither, for it would be inappropriate to accept or reject an explanation that, for all we know, the district court never actually considered. Because the court offered no explanation for the extent of its departure, the case must be remanded for resentencing.

---

ring while the defendant is awaiting trial for the offense of conviction. *United States v. Jordan,* 890 F.2d 968, 973, 976–77 (7th Cir.1989); *United States v. Sanchez,* 893 F.2d 679, 681 (5th Cir. 1990); 18 U.S.C. § 3553(b).

5. The government would treat the MCC activity as though it had resulted in a prior conviction for extortion, for which Tai probably would have been sentenced to more than one year of imprisonment, and which, therefore, would have increased his criminal history by three points. Guideline 4A1.1(a). Tai, however, says the better approach is to treat the MCC activity as though it

*United States v. Thomas,* 906 F.2d 323, 328 (7th Cir.1990).

## III. Conclusion

For the foregoing reasons, we affirm the judgment of conviction but vacate the sentence imposed by the district court and remand the case for resentencing. On remand, should the district court consider an offense-level increase under § 3B1.1, it shall do so in accordance with Part II.B.1. of this decision, stating the factual basis for its conclusion. Should it consider an upward departure under § 4A1.3, it shall do so in accordance with Part II.B.2. of this decision, setting forth the factual basis for the departure and explaining the extent of the departure.

So Ordered.

---

resulted in a conviction contemporaneous to his actual convictions and was assigned an offense level of 20. Because that offense level is 13 levels lower than the offense level of Tai's actual convictions, it could not have been used to increase Tai's total offense level. Guideline § 3D1.4(c). Therefore, Tai says, the activity would not justify a criminal history departure, although it might justify a sentence at the higher end of the applicable range.

We express no opinion on the reasonableness of either analogy, nor do we suggest that the district court must choose between them.