In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-2708 & 01-2937

United States of America,

Plaintiff-Appellee,
Cross-Appellant,

v.

Carlos Gallo-Vasquez,

Defendant-Appellant,
Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 644--Ruben Castillo, Judge.

Argued March 1, 2002--Decided March 27, 2002

   Before Flaum, Chief Judge, and Bauer and
Harlington Wood, Jr., Circuit Judges.

   Flaum, Chief Judge.  The appellant,
Carlos Gallo-Vasquez, was convicted of
offenses surrounding his participation in
drug trafficking. The district court
sentenced Gallo-Vasquez to prison for 135
months, with five years of supervised
release. The sentence that the district
court imposed included an enhancement for
the alleged "supervisory role" that
Gallo-Vasquez played in the execution of
a drug transaction and a downward
departure based upon the fact that Gallo-
Vasquez was a deportable alien. Gallo-
Vasquez has filed the instant appeal
contesting the propriety of the district
court's enhancement of his sentence and
the government has filed a cross-appeal
challenging the district court's downward
departure. For the reasons stated below,
we affirm in part and reverse and remand
in part the decisions of the district
court.

I.  BACKGROUND
   In early August of 2000, United States
customs officials at the border in Texas
detected a vehicle attempting to enter
the country carrying narcotics. That
vehicle, a large truck, contained over
four thousand sacks of charcoal. However,

the sacks also contained significant amounts of marijuana--the total amount of which exceeded five thousand pounds. After an investigation, customs officials discerned that the truck was headed for Chicago. After learning the truck's destination, law enforcement officials attempted to set up a controlled delivery of the truck for August 8, 2000. On August 9, an undercover Chicago police officer drove the truck to the delivery address that was discovered during the course of the investigation. Upon arrival at this address, the undercover officer found that there was no one present to receive the shipment. Several phone calls were made and eventually the undercover officer was told to bring the truck to a warehouse located on Chicago's south side.

As the undercover officer approached the warehouse where the delivery was to be made, a female approached the truck and told him to park it in the rear. The undercover officer pulled his truck to the rear of the warehouse, where he was directed to pull in front of a loading dock. The officer then watched as six or seven Hispanic men began to unload the truck. The undercover officer was able to identify Gallo-Vasquez as he stood with another man observing the unloading of the sacks of charcoal. After several minutes had elapsed, the officer asked one of the men who had unloaded the truck to sign the bill of lading. Rather than sign the bill of lading himself, this man spoke to Gallo-Vasquez and another man. Gallo-Vasquez then signed the bill of lading with the name "Eduardo Flores." After receiving the signed document, the undercover officer entered his truck and drove from the loading dock.

Shortly after the undercover officer departed, law enforcement agents entered the warehouse and arrested eight individuals, including Gallo-Vasquez. From the eight individuals arrested, the government indicted only two: Gallo-Vasquez and Asael Sanchez. Sanchez ultimately pleaded guilty and agreed to testify at Gallo-Vasquez's trial. At Gallo-Vasquez's trial, Sanchez told the story of his involvement in the August 9 delivery. According to Sanchez, on August 9, he received $500 to help unload the truck driven by the undercover officer. Sanchez further testified that once the

charcoal bags were unloaded, Gallo-Vasquez told him (and the others who had removed the cargo from the truck) to open the bags and separate the contents. While separating the smaller bags, Sanchez testified that he and others saw a package which they believed to contain drugs. Sanchez stated that he and the other individuals were then told that they would be given more money if they continued to work. Around this time, law enforcement officials entered the warehouse. When the officers entered the warehouse, the men unloading the truck attempted to flee.

After his trial, the jury convicted Gallo-Vasquez of possession of more than 1,000 kilograms of marijuana with intent to distribute. On June 26, 2001, the district court conducted a sentencing hearing at which it asked Gallo-Vasquez if he had reviewed the pre-sentence report ("PSR") that had been prepared in his case. Through his counsel, Gallo-Vasquez made an objection to certain facts contained in the PSR. Gallo-Vasquez also objected to certain "interpretations" that it contained. Sentencing Tr. at 4. Specifically, Gallo-Vasquez objected to the recommendation that his sentence be adjusted for his supervisory "role in the offense" under section 3B1.1 of the Sentencing Guidelines./1 Id. In addition, Gallo-Vasquez requested a downward departure in his sentence because of his status as a deportable alien.

In imposing a sentence, the district court enhanced Gallo-Vasquez's sentence by three levels because it concluded that he undertook a supervisory role in the delivery of the drugs in question./2 Lastly, the district court granted a four-level downward departure to Gallo-Vasquez because it concluded that, as a deportable alien, "he will have a worse situation than would other people of U.S. citizenship convicted of the exact same thing with the exact same history." Id. at 14. Ultimately, the district court sentenced Gallo-Vasquez to 135 months' imprisonment with a five-year period of supervised release.

Gallo-Vasquez filed the instant appeal claiming that the district court erred in enhancing his sentence because of his alleged supervisory role in the offense.

According to Gallo-Vasquez, the district court did not find that there were five or more criminally culpable participants in the underlying criminal activity, as required by the sentencing guidelines. The government also cross-appeals, arguing that the district court committed legal error and abused its discretion in allowing for a downward departure in Gallo-Vasquez's sentence based upon Gallo-Vasquez's alien status.

## II. DISCUSSION

We review the district court's findings of fact at sentencing (in this case with regard to whether Gallo-Vasquez acted as a manager or supervisor of others in criminal conduct) for clear error. See United States v. Young, 34 F.3d 500, 504 (7th Cir. 1994). This court reviews a district court's downward departures from the Sentencing Guidelines for abuse of discretion. See United States v. Purchess, 107 F.3d 1261, 1270 (7th Cir. 1997).

## A. Enhancement for Supervisory Role

Gallo-Vasquez contends that the district court erred in enhancing his sentence for acting in a supervisory capacity during the August 9, 2000 drug transaction. In particular, Gallo Vasquez claims that the district court did not adequately find that there were five other participants involved in the drug transaction. "The government must prove by a preponderance of the evidence that an enhancement is warranted." United States v. Scott, 245 F.3d 890, 912 (7th Cir. 2001). Furthermore, for an enhancement made pursuant to the section 3B.1(b) of the Sentencing Guidelines, the factual basis should be made clear on the record. See, e.g., Untied States v. Tai, 994 F.2d 1204, 1212 (7th Cir. 1993).

While the district court did not furnish an exhaustive explanation of its decision to enhance Gallo-Vasquez's sentence for his supervisory role over five or more participants, we find that its findings are nonetheless adequate and do not amount to clear error. In the instant case, there was ample evidence presented at trial to support the district court's finding that Gallo-Vasquez acted as a supervisor of five people engaged in criminal activity. First, Asael Sanchez

testified that when the bags of charcoal were unloaded from the targeted truck, Gallo-Vasquez ordered up to eight individuals to separate the contents of the bags. Asael Sanchez further testified that, upon seeing that the bags contained marijuana, he and several of the men unloading the truck stopped working, only to continue when Gallo-Vasquez promised the payment of more money. Indeed, when law enforcement officials raided the warehouse where the unloading of the truck was taking place, Sanchez and five other individuals ran. This permissibly suggests that these men knew that they were participating in an illegal activity. See United States v. Smith, 34 F.3d 514, 521 (7th Cir. 1994) (evidence of defendant's flight can be probative of that defendant's consciousness of guilt). These facts, in addition to other testimony adduced at trial, support the district court's finding that at least five men were involved in criminal activity and Gallo-Vasquez acted as their supervisor. See United States v. McKinney, 98 F.3d 974, 982 (7th Cir. 1996) ("Even where the district court has failed to make specific findings with regard to a defendant's role as a leader or organizer, we have affirmed where the record adequately supports such a determination.").

B.  Downward Departure Based Upon Alien Status

   In its cross-appeal, the government contends that the district court abused its discretion in granting a four-level downward departure on Gallo-Vasquez's sentence because of his status as a deportable alien. In making this argument, the government urges this court to overturn its decision in United States v. Farouil, 124 F.3d 838 (7th Cir. 1997), in which we allowed for a departure based upon a defendant's status as an alien. We decline to overturn Farouil. However, we reverse and remand the district court's decision on this matter because the district court failed to articulate any factors that would justify a downward departure. Therefore, the district court's decision amounts to an abuse of discretion.

   Our decision in Farouil followed the Supreme Court's opinion in Koon v. United States, 518 U.S. 81 (1996), which allows

district courts, in deciding to grant downward departures, to consider unusual or exceptional circumstances not contemplated in the Sentencing Guidelines. In Farouil, we reversed a sentence imposed by the district court when the district court "appear[ed] to have been under the impression that it lacked discretion to depart on the basis of status as a deportable alien . . . ." Farouil, 124 F.3d at 847. According to our reasoning, reversal was warranted because the district court, in refusing to consider a characteristic of the defendant (namely, alienage), violated the dictates of Koon. Id. However, Farouil contains no language that mandates sentencing courts to enter downward departures every time a defendant is a deportable alien. Indeed, in cases subsequent to Farouil, we have found that, in considering a downward departure, a "defendant's status as a deportable alien is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense." United States v. Guzman, 236 F.3d 830, 834 (7th Cir. 2001) (emphasis in original).

In the instant case, the district court made no finding that Gallo-Vasquez would suffer conditions more onerous than those contemplated by the Sentencing Guidelines because of his status as an alien. Indeed, due to the nature of Gallo-Vasquez's offense and the probability of his flight, it is unlikely that he would be entitled even to participate in the types of discretionary prison alternatives (e.g., a stay in halfway house) often available to citizen-defendants./3 Instead, in granting the downward departure, the district court categorically stated, "I do know that because of [Gallo-Vasquez's] citizenship status, he will have a worse situation than would other persons of U.S. citizenship convicted of the exact same thing with the exact same criminal history . . . ." Sent. Tr. at 14. The district court did not expound on how the defendant's conditions of confinement would differ as a result of his alienage and whether those differences would have made the defendant's sentence more

onerous than was contemplated by the framers of the Sentencing Guidelines.

Accordingly, we vacate the district court's departure on Gallo-Vasquez's sentence and remand this case with instructions that the district court examine the actual effects that Gallo-Vasquez's alien status will have upon his sentence and whether those effects will move Gallo-Vasquez's sentence beyond the "heartland" of cases contemplated by the framers of the Sentencing Guidelines when they crafted proposed sentences for defendants convicted of similar crimes.

## III. CONCLUSION

For the foregoing reasons, we Affirm in part and Reverse and Remand in part the decisions of the district court.

## FOOTNOTES

/1 In relevant part, that section provides for the enhancement of a defendant's sentence "[i]f the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants . . . ." U.S.S.G. sec. 3B1.1(b).

/2 In addition, the district court also enhanced Gallo-Vasquez's sentence for obstruction of justice, a result of Gallo-Vasquez's incredible testimony on his own behalf.

/3 We also note that an alien's ineligibility to participate in halfway house or other transition- ary programs need not constitute an automatic basis for a downward departure, as under such a regime, every illegal alien would qualify for a downward departure. Instead, district courts should thoroughly examine whether there are "exceptional circumstances" (which can include a host of factors) warranting leniency. See Guzman, 236 F.3d at 834.