UNITED STATES of America, Plaintiff,

v.

Noe FERRERIA, Defendant.

No. 01–CR–143.

United States District Court, E.D. Wisconsin.

Nov. 6, 2002.

Brian Pawlak, Racine, WI, for Plaintiff.

Robert Rascia, Chicago, IL, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Defendant Noe Ferreria pled guilty to conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841 & 846. The parties agree as to the applicable sentencing guidelines. The issue before me is wheth-

er defendant should receive a downward departure because of his status as a deportable alien. Based on the extraordinary hardship that deportation will cause this defendant, I conclude that a departure is warranted.

## I.

Defendant was charged, along with David Barreto, Guadalupe Garcia, Javier Hernandez and Vidal Lepe, with conspiracy to distribute and possession with intent to distribute at least five kilograms of cocaine. The indictment arose out of a controlled buy operation conducted by the government through the use of a confidential informant. The informant initially contacted Lepe, indicating that she had customers in the Milwaukee area interested in obtaining cocaine. Lepe then contacted Alfonso Hernandez about the matter, who in turn recruited Barreto to locate or broker the purchase of cocaine. Barreto located cocaine in Chicago, and on July 26, 2001, the conspirators and the informant met in Milwaukee to complete the transaction. Unbeknownst to the conspirators, the DEA was monitoring their movements and conversations through a wire worn by the informant.

The informant, Lepe, Garcia, and Javier Hernandez (Alfonso's son) drove to Chicago, where they rendevoused with Barreto and defendant. Defendant was brought into the conspiracy by Barreto because he was a truck driver and knew the route to Milwaukee. The cocaine was loaded into defendant's van, and the conspirators proceeded to Milwaukee. However, law enforcement stopped the van in Kenosha County, Wisconsin and seized ten kilograms of cocaine.

Defendant pled guilty to the conspiracy charge, and a pre-sentence report (PSR) was prepared. The PSR indicated that defendant was subject to a ten year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A)(ii) because the offense involved more than five kilograms of cocaine. He was not eligible to be sentenced under the guidelines pursuant to the "safety valve" provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 because he had not provided complete and truthful information to the government about the offense.[1]

When the parties appeared for sentencing on August 20, 2002, I expressed concern that a defendant who had played only a minor role in the offense[2] and had no record was receiving a sentence far in excess of that required by law simply because he had not provided information to the government.[3] I adjourned sentencing so that he could do so if he wished.

1. Under the safety valve provisions, a defendant otherwise subject to a mandatory minimum sentence may be sentenced under the applicable guidelines, and receive a two level reduction under U.S.S.G. § 2D1.1(b)(6), if five criteria are met:(1) the defendant does not have more than one criminal history point, as determined under the sentencing guidelines; (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon; (3) the offense did not result in death or serious bodily injury to any person; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense; and (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. It was undisputed based on the information in the PSR that defendant met the first four criteria.

2. In fact, the parties agreed that defendant was eligible for a reduction in offense level under U.S.S.G. § 3B1.2 based on his mitigating role in the offense.

3. Defendant's guideline sentence was less than half the mandatory minimum.

Defendant then met with the Assistant United States Attorney and investigative case agents and provided information about his involvement in the offense. On November 5, the parties again appeared for sentencing. The government agreed that defendant was now eligible for the safety valve. The parties also agreed that the appropriate offense level under the guidelines was 23.[4] Coupled with a criminal history category of I, the imprisonment range was 46–57 months. I adopted these guideline calculations. Defendant then requested that I depart downwardly based on his status as deportable alien. In this decision I consider his request.

## II.

Defendant is a thirty-nine year old citizen of Mexico, who has lawfully resided in this country as a permanent resident alien for twenty five years. He came here with his siblings when he was fifteen years old. He lives with his five children, all of whom are United States citizens because they were born here, and their mother. Defendant has been gainfully employed during his time in the United States. Seven of his eight siblings live in this country.

Despite being in the United States lawfully, defendant indicates that as a result of this conviction he will be subject to deportation to Mexico. Defendant asserts that due to his status as a deportable alien he will be subject to harsher conditions of confinement than non-aliens: he will be housed in a higher security facility, he will be ineligible for certain programs that would reduce his period of incarceration, and he will not be eligible for placement at a community correctional center as he nears completion of his sentence. Fur-

ther, he asserts that his deportation will cause extreme hardship because his family resides here, and that they will be forced to choose between separation from him and leaving the United States. Finally, he notes that he came to this country to live and work, not engage in criminal activity. He has no prior record.

The court may "depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (quoting 18 U.S.C. § 3553(b)). The Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "encouraged" bases for departure, and "discouraged" bases for departure. *Id.* at 93–95, 116 S.Ct. 2035

The Supreme Court has thus adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden departures based on those factors? (3) If not, has the Commission encouraged departures based on those factors? (4) If not, has the Commission discouraged departures based on those factors? *Id.* at 95, 116 S.Ct. 2035.

If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a dis-

---

**4.** The base offense level under U.S.S.G. § 2D1.1(a)(3) (2002) was 30; defendant received a two level reduction under § 2D1.1(b)(6) (safety valve), a two level reduc-

tion under § 3B1.2 (mitigating role in the offense), and a three level reduction under § 3E1.1 (acceptance of responsibility).

couraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (citations and internal quote marks omitted).

In the present case, the factor that potentially takes the case out of the guidelines' heartland is defendant's status as a deportable alien, a factor unmentioned in the guidelines. In *United States v. Farouil,* 124 F.3d 838, 847 (7th Cir.1997), the court held that so long as the defendant's alien status is not accounted for in the applicable guideline (as where the offense is one of unlawful reentry following deportation) [5] district courts are free to consider whether this factor causes "unusual or exceptional hardship in his conditions of confinement," justifying a departure.

The Seventh Circuit has re-visited this issue on several occasions since *Farouil.* In *United States v. Guzman,* 236 F.3d 830, 834 (7th Cir.2001) the court rejected the contention that deportation itself is a form of punishment that justifies a departure. This "implies that any alien who commits a crime should receive a shorter sentence than a citizen." *Id.* However, the court acknowledged that

the status of being a deportable alien can affect the conditions of imprisonment, can make them harsher by disentitling a defendant to serve any part of his sentence in a halfway house, minimum security prison, or intensive confinement center, so that the same nominal prison sentence would be, quite apart from the sequel of deportation, a more severe punishment than if the defendant were a citizen.

*Id.* (citation omitted). Therefore, in "exceptional circumstances," such considerations may provide a basis for a downward departure. *Id.*

But we emphasize that the defendant's status as a deportable alien is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense. *Id.*

In *United States v. Bautista,* 258 F.3d 602, 606 (7th Cir.2001), the court stated that although deportation itself does not provide a basis for departure, a defendant may be able to "point[ ] to individualized circumstances that ... make deportation extraordinarily harsh for him.... Nothing in the Guidelines ... forbids consideration of extralegal consequences that follow a sentence as grounds for a departure."

The court also rejected the notion that [b]asing a downward departure on the harsh effects of deportation is irrational ... because the shortened sentence merely hastens the onset of those effects. [T]he apparent paradox disappears if one views the departure not as

---

5. *See United States v. Gonzalez–Portillo,* 121 F.3d 1122, 1125 (7th Cir.1997) (holding that status as a deportable alien is not a proper basis for departure when the crime of conviction is one involving illegal presence in the United States); *see also United States v. Martinez–Carillo,* 250 F.3d 1101, 1106–07 (7th Cir.), *cert. denied,* 534 U.S. 927, 122 S.Ct. 285, 151 L.Ed.2d 210 (2001) (re-affirming *Gonzalez–Portillo* in light of *Farouil* and *Koon.*).

remedying the consequences of deportation, but as an offset to those consequences—just as in *Farouil*, where we held that a departure could be warranted to offset unusually harsh conditions of confinement.

*Id.* (citation omitted).

Finally, in *United States v. Gallo–Vasquez*, 284 F.3d 780, 784 (7th Cir.2002), the court reiterated that "*Farouil* contains no language that mandates sentencing courts to enter downward departures every time a defendant is a deportable alien." The court then reversed the departure granted by the district court because the judge

> made no finding that Gallo–Vasquez would suffer conditions more onerous than those contemplated by the Sentencing Guidelines because of his status as an alien. Indeed, due to the nature of Gallo–Vasquez's offense and the probability of his flight, it is unlikely that he would be entitled even to participate in the types of discretionary prison alternatives (e.g., a stay in halfway house) often available to citizen-defendants.

*Id.* at 784–85.

Therefore, the Seventh Circuit has set forth the following standards for departures based on a defendant's status as a deportable alien. Before considering such a departure the district court must find that the applicable guideline does not take the defendant's deportable alien status into account. The defendant must then establish hardship aside from the fact of his deportation. He can do this in two ways. First, he can show that his conditions of confinement will be substantially more onerous than the Commission intended in setting the applicable sentence. However, the court should not depart if the defendant would be ineligible for more favorable prison conditions notwithstanding his deportable status. Second, the defendant can show that his individual circumstances make deportation extraordinarily harsh, as, for example, where he will be sent to a country he does not know and/or will be separated from his family and friends. Finally, the district court must make specific findings justifying the departure. With these standards in mind I turn to the present case.

Defendant has been convicted of a drug offense, and the applicable guideline does not take into account his deportable alien status. *See* U.S.S.G. § 2D1.1. Therefore, I am authorized to consider a departure. *See Farouil*, 124 F.3d at 847 (holding that district court may consider departure for alien-defendant convicted of importing heroin).

Defendant attempts to justify a departure primarily on the harsher conditions of confinement he believes he will face. He states that because of his status he will be placed in a higher security facility, will be ineligible for certain programs offered by the Bureau of Prisons (BOP) that could result in additional good time credit, shortening his sentence, and will be ineligible for placement at a halfway house at the end of his sentence.

Defendant also notes that he will be "kicked out" of the United States after twenty-five lawful and productive years. He states: "The extreme hardship this will cause the defendant is difficult to predict, but clearly this expulsion will effect the defendant and his family, all of which now lawfully reside in the United States. They will be forced to decide between the break up of their family unit and residing in the United States." (Motion for Downward Departure at 3–4.)

I conclude that defendant has not made the requisite showing under the first theory but has shown that a departure is warranted under the second.

Any departure based on the anticipated harshness of the defendant's conditions of confinement will be somewhat speculative. *See* Note, *Sentencing Equality for Deportable Aliens: Departures from the Sentencing Guidelines on the Basis of Alienage,* 98 Mich. L.Rev. 1320, 1333–35 (2000) [hereinafter *"Deportable Aliens"*]. The sentencing judge does not know, for example, exactly where the BOP will place a defendant; the judge may make a recommendation, but the ultimate decision rests with the Bureau. *See* 18 U.S.C. § 3621(b). However, in the situation of deportable aliens, the sentencing judge can, based on clearly established BOP policies, often predict that an alien's conditions of confinement will be harsher.

First, deportable aliens must be housed in at least a low security level institution. *See* Federal Bureau of Prisons, Security Designation and Custody Clarification Manual, Program Statement 5100.07, ch. 7, at 3 (1999) [hereinafter "PS 5100.07"], *available at www.bop.gov.*[6] Second, deportable aliens are usually precluded from serving the final portion of their sentences in a halfway house or community correctional center. Title 18, U.S.Code § 3624(c) provides that, to the extent practicable, the BOP shall assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10% of his term in such a facility or in home confinement. A deportable alien[7] may participate in such a prerelease program only if he can establish (1) a verifiable history of stable, full-time employment for at least three years prior to incarceration, (2) a verified history of domicile in the United States for at least five years prior to incarceration, and (3) verified

strong family ties in the United States. PS 5100.07, ch. 7, at 3. These requirements make it difficult for many aliens to qualify for prerelease programs. *See Deportable Aliens, supra,* at n. 13 (citing *United States v. Smith,* 27 F.3d 649, 651 n. 2 (D.C.Cir.1994)). Moreover, "if the INS has ordered the alien to be deported following incarceration, the alien will be denied access to community confinement even if he or she meets these three requirements." *Id.* (citing PS 5100.07, ch. 7, at 4).

■ However, it is important to remember that a departure may not be based on conditions of confinement that would be present if the defendant were a citizen. *Gallo–Vasquez,* 284 F.3d at 784–85; *see also United States v. DeBeir,* 186 F.3d 561, 570 (4th Cir.1999) (rejecting downward departure where basis for defendant's ineligibility for less restrictive confinement was the nature of his offense not his alien status). In the present case, based on defendant's offense of conviction, it is doubtful that he would be placed at a minimum security prison camp in any event. *See United States v. Bahena,* 223 F.3d 797, 807 (8th Cir.2000), *cert. denied,* 531 U.S. 1181, 121 S.Ct. 1163, 148 L.Ed.2d 1023 (2001) ("Conviction of trafficking in a large amount of drugs ... makes it unlikely that defendant would have been placed in a minimum-security facility [even if he were a citizen.]"). The Probation Office advises that the BOP places deportable aliens at institutions ranging from low to high security as is warranted by their offense levels and other characteristics.

Neither can defendant clearly show that he will lose the opportunity to participate

---

6. The BOP has four security levels: minimum, low, medium, and high. *See* PS 5100.07, ch. 5 at 15.

7. The BOP defines a "deportable alien" as an "inmate who is a citizen of a foreign country, rather than the United States." PS 5100.07, ch. 7, at 3.

in other prison programs that could reduce his sentence. He is likely ineligible for the 500 hour drug program offered pursuant to 18 U.S.C. § 3621(e) because he denies a drug problem;[8] not all BOP facilities offer the program, to citizens or aliens; the Bureau of Prisons has discretion with respect to such programs when they are available, and completion does not necessarily guarantee a reduction in sentence. *See Awe v. United States,* No. 99–C–606, 2002 U.S. Dist. LEXIS 8665, at *10–11, *13–14 (N.D.Tex. May 15, 2002), *adopted by,* 2002 U.S. Dist. LEXIS 9901 (N.D.Tex. May 31, 2002); *see also United States v. Lopez–Salas,* 266 F.3d 842, 847–48 (8th Cir.2001) (noting substantial discretion BOP has in granting early release following completion of drug treatment, including authority to categorically exclude certain classes of offenders). Similarly, the shock incarceration or "boot camp" program is available only to those defendants sentenced to between twelve and thirty months imprisonment, 18 U.S.C. § 4046(a), below defendant's range, and the BOP also possesses considerable discretion in making placement decisions under this program. *See Gissendanner v. Menifee,* 975 F.Supp. 249, 251 (W.D.N.Y.1997).

This leaves ineligibility to serve the last 10% of his sentence in a halfway house. This is an insufficient basis for a departure in the present case. First, defendant has not shown that he will not meet the three criteria for halfway house release. Defendant has been in this country and employed for many years, and his immediate family, including his children, reside here. Second, placement in this program is not automatic, but rather only "to the extent practicable." 18 U.S.C. § 3624(c). The BOP possesses substantial discretion in such matters. *See Prows v. Federal Bu-*

*reau of Prisons,* 981 F.2d 466, 469 (10th Cir.1992). Finally, even if he does lose this opportunity, the Seventh Circuit has cautioned that ineligibility for this program alone "need not constitute an automatic basis for a downward departure." *Gallo–Vasquez,* 284 F.3d at 785 n. 3. Therefore, based on all of these circumstances, I decline to exercise my discretion and depart on this basis.

But defendant's second argument is availing. Defendant has shown that, for him, the consequences of deportation will be extraordinarily harsh. He came to the United States as a fifteen year-old with his siblings and has lived here for twenty-five years. He has five children, and he resides with them and their mother, with whom he has been involved since September 1987. All of his children were born in this country, are citizens of the United States, and attend school here. By all accounts defendant is a devoted father who has regularly supported his children. He has consistently maintained employment. He holds a commercial driver's license and was employed as a truck driver for six years prior to the present offense. Before that he worked as a porter for five years and as a butcher for eleven years. Defendant came to this country legally and holds the status of permanent resident. He has no criminal record.

These circumstances are extraordinary. Few, if any, of the many deportable aliens who have appeared before me have established the strong ties to the United States that Ferreria has. Further, few have established such a positive record. When defendant is deported he will be sent to a country he has not known as an adult. Worse yet, he will likely lose his family. Although his children and their mother may choose to follow him to Mexico, this

---

**8.** *See* 28 C.F.R. § 550.58 (noting that inmates "determined to have a substance abuse prob-

lem" may be eligible for early release upon completion of residential drug treatment).

appears to be unlikely inasmuch as his children are citizens who have lived in this country their entire lives. By losing his family defendant will suffer a severe punishment.[9]

In *United States v. Agu,* 763 F.Supp. 703 (E.D.N.Y.1991), Judge Weinstein departed downward under similar circumstances. The defendant there was also a permanent resident alien who had resided in the United States for many years. He was married to a permanent resident and had a one and one-half year old daughter who was a citizen of the United States by virtue of being born here. He could have applied for citizenship but never did so. Nevertheless, following his conviction for importation of heroin, he was subject to deportation, resulting in the "permanent separation from [his] wife and American born child." *Id.* at 704. I agree with Judge Weinstein that these are mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Commission. *Id.* (citing 18 U.S.C. 3553(b)). Because defendant has shown that deportation will wreak an extraordinary hardship on him, I will depart downward.

■ Once a court decides to depart the extent of the departure is a matter within the court's discretion and will be upheld so long as it is reasonable. *United States v. Cruz–Guevara,* 209 F.3d 644, 647 (7th Cir. 2000); *see also* 18 U.S.C. § 3742(f). There are no "hard and fast rules" governing the extent of a departure, *Cruz–Guevara,* 209 F.3d at 648; rather, the "law merely requires that district judges link the degree of departure to the structure of the Guide-

lines and justify the extent of the departure taken." *United States v. Scott,* 145 F.3d 878, 886 (7th Cir.1998). The Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *Cruz–Guevara,* 209 F.3d at 648.

■ In determining the extent of departure under these circumstances, the closest analogy to an existing guideline is to U.S.S.G. § 2L2.1(b)(1), which provides for a three level reduction in certain immigration offenses if the crime "involved the smuggling, transporting, or harboring only of the defendant's spouse or child." Here, defendant's immigration status will result in his deportation and the separation from his family following completion of his prison sentence. Because the Commission has concluded that the penalty in immigration offenses should be reduced by three levels when the defendant seeks only the company of his family, a downward departure of three levels to "compensate" a deported defendant for the loss of his family is reasonable by analogy.

However, because of other circumstances particular to this case, which are unrelated to the basis for departure, I will depart by only one level. On November 1, 2002, the guidelines were amended to "cap" at 30 the base offense level of defendants convicted of drug offenses who received reductions for role in the offense under § 3B1.2. *See* U.S.S.G. § 2D1.1(a)(3) (2002). Defendant's base offense level under the 2001 guidelines was 32. He was initially scheduled to be sentenced in August 2002, but sentencing was adjourned to enable him to satisfy his obligations under

---

9. I stress that the basis for this departure is not defendant's extraordinary family circumstances. *See* U.S.S.G. § 5H1.6. In cases involving such departures the focus is on the needs of the defendant's dependents, and the effort is to craft a sentence that keeps the

family intact. *See United States v. Norton,* 218 F.Supp.2d 1014 (E.D.Wis.2002). In this case, nothing I do will keep the family together. However, I can mitigate some of the harshness of the resulting deportation by reducing the sentence.

§ 5C1.2(a)(5).[10] Thus, it was fortuitous that he was sentenced under the 2002 guidelines, rather than the 2001 version. *See United States v. Schaefer*, 291 F.3d 932, 936 n. 1 (7th Cir.2002) (stating that, unless ex post facto concerns dictate otherwise, the court should use the guidelines in effect on the date of sentencing). It would be inappropriate to award a three level downward departure to defendant on top of the two level "reduction" he received because his case was adjourned.[11] A one level departure, therefore, results in the same sentence as a three level departure would have if defendant had been sentenced prior to November 1, 2002.

■ The departure comports with the purposes of sentencing under 18 U.S.C. § 3553(a). Under § 3553(a), I consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide for the defendant's rehabilitative needs; (3) the kinds of sentences available; (4) any pertinent policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to the victims of the offense.

While the present offense involves a serious violation of the drug laws, all parties agree that defendant's role in it was minor: he was not involved in its planning, did not procure the drugs, served only as a courier, and had no agreement as to profit. Even with a departure, defendant faces more than three years in prison, substantial time for someone with no prior record. Others will be deterred by the prospect of even this reduced sentence. Finally, defendant is not someone from whom the public must be protected: he has no prior record and has been gainfully employed.

With the departure, defendant's imprisonment range is 41–51 months. I sentence defendant to 41 months in prison. Other conditions of the sentence appear in the judgment of conviction.

### III.

All aliens who commit serious crimes in this country face serious consequences: imprisonment, loss of certain opportunities while incarcerated, and eventual deportation. But Noe Ferreria faces an even more profound deprivation: the loss of his family. This is a circumstance not adequately accounted for in the guidelines. Therefore, in an effort to mitigate some of the harshness of this outcome, I grant

---

**10.** I note that a defendant has an affirmative obligation to come forward and satisfy his obligations under § 5C1.2(a)(5). The court is certainly under no obligation to adjourn sentencing to allow him to do so. *Cf. United States v. Marin*, 144 F.3d 1085, 1095 (7th Cir.1998) (holding that district court erred in providing defendant with repeated opportunities to provide complete and truthful information in order to qualify for safety valve).

**11.** I note that Amendment 640 to the guidelines, which established the level 30 "cap" under § 2D1.1(a)(3), is not retroactively applicable. *See* U.S.S.G. § 1B1.10(c). Therefore,

if he had been sentenced prior to November 1, 2002, defendant could not have moved the court pursuant to 18 U.S.C. § 3582(c)(2) for a reduction in his sentence as a result of the amendment to his guideline range. *See United States v. Torres*, 99 F.3d 360, 363 (10th Cir.1996) (holding that only amendments designated as retroactively applicable by the Commission in U.S.S.G. § 1B1.10 may serve as the basis for a § 3582(c)(2) motion). Thus, defendant's sentence was fortuitously decreased by two levels based on the timing of his sentence.

defendant's motion for a downward departure.

**IT IS SO ORDERED.**